**Kevin B. GUISHARD and Steven G. Braxton, Appellants,**

**v.**

**UNITED STATES, Appellee.**

**Nos. 92–CF–1368 and 92–CF–1459.**

District of Columbia Court of Appeals.

Argued Jan. 13, 1995.
Decided Dec. 29, 1995.

Sheila B. Albright, appointed by the court, for appellant Guishard.

Patricia Newton, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant Braxton.

Sima F. Sarrafan, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Robert L. Walker, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and GALLAGHER, Senior Judge.

TERRY, Associate Judge:

Appellants were convicted of distribution of cocaine while armed [1] (two counts), possession of cocaine while armed with intent to distribute it,[2] possession of a firearm during a crime of violence or dangerous offense,[3] possession of marijuana,[4] possession of drug paraphernalia,[5] possession of an unregistered firearm,[6] and unlawful possession of ammunition (two counts).[7] On appeal both appellants contend that the evidence was insufficient to support their convictions. Appellant Braxton argues in addition that the trial court erred in failing to give a jury instruction defining the statutory term "armed with or having readily available a pistol," in failing to instruct the jury on the issue of foreseeability as it relates to aiding and abetting, in permitting the government to imply that appellants were drug dealers from New York,

1. D.C.Code §§ 33–541(a)(1) (1993), 22–3202 (1989).

2. D.C.Code §§ 33–541(a)(1) (1993), 22–3202 (1989).

3. D.C.Code § 22–3204(b) (1995 Supp.).

4. D.C.Code § 33–541(d) (1993).

5. D.C.Code § 33–603(a) (1993).

6. D.C.Code § 6–2311(a) (1995).

7. D.C.Code § 6–2361(3) (1995).

and in denying his motion for disclosure of an informant's identity. Appellant Guishard also claims that the trial court erred in failing to strike certain remarks made by the prosecutor during his closing argument. We affirm.[8]

## I. THE FACTS

### A. *The Government's Evidence*

On the evening of May 15, 1991, undercover police officers Towanna May and Cheryl Tillman entered an apartment at 1012 Harvard Street, N.W. The officers told the man who answered the door, Louis Smith, that they were looking for a "fifty" and a "twenty." Smith instructed them to wait in the living room and went to the back of the apartment. He returned a few moments later and asked the officers to follow him to a small rear bedroom, where Braxton and Guishard were waiting. The bedroom contained two beds, a nightstand, and a dresser. Guishard was sitting on one of the beds; Braxton was standing between the two beds near Guishard. Guishard asked Smith who wanted the "fifty," and Officer May replied that she did. At that point Smith left the room, closing the door behind him.

After a brief discussion between Braxton and Guishard as to who had the "rocks," Braxton handed Guishard an empty plastic ziplock bag and a napkin containing pieces of "a loose rock-like substance." Guishard placed some of these pieces into the ziplock bag and handed it to Officer May, who gave him in exchange $50 in currency whose serial numbers had been pre-recorded. Officer Tillman then said that she wanted a "twenty." Braxton handed Guishard a black bicycle pouch, and from it Guishard removed two pink-tinted ziplock bags containing what appeared to be crack cocaine, which he gave to Officer Tillman in exchange for $20 in pre-recorded funds. May then told Guishard that she wanted another "fifty," and Guishard prepared another $50 bag of cocaine from the contents of the bicycle pouch. At one point Guishard walked a few steps to retrieve something from the top of the dress-

er. After the transaction was completed, the two officers were escorted out of the apartment by Mr. Smith.[9]

As Officers Tillman and May left the apartment building, they signaled to a team of other officers waiting in a nearby car that a drug sale had just taken place. Tillman and May then went to their car and broadcast a lookout description for Guishard, Braxton, and Smith. Moments later, Braxton came out of the building and walked to a nearby gas station, where he was stopped by some officers from the arrest team. At approximately the same time, other members of the arrest team entered the apartment with a search warrant. They detained Guishard as he was coming out of the bathroom. Shortly thereafter Braxton, Guishard, and Smith were taken to a nearby street corner, where they were identified by Tillman and May as the men who had sold them the cocaine.

A search of the apartment yielded drugs, drug paraphernalia, a pistol, ammunition, and personal documents belonging to both Braxton and Guishard. A .32 caliber pistol, loaded and operable, was recovered from the top drawer of the dresser in the bedroom where the transactions took place (referred to in the testimony as "bedroom two"). A ziplock bag containing two smaller bags of marijuana was found inside the lampshade of a lamp on the nightstand in bedroom two, and a larger bag of marijuana was found on a closet shelf in the other bedroom ("bedroom one"). Another ziplock bag containing five smaller bags of cocaine was found inside the toilet tank in the bathroom. The bicycle pouch was also recovered from the bathroom. It contained $380 in cash, including the $120 in pre-recorded funds used by May and Tillman to purchase the drugs. A pager was lying on top of one of the beds in bedroom two. Live ammunition and drug paraphernalia were found at various places throughout the apartment: under both beds in bedroom two, on the television stand in bedroom two, on a closet shelf in bedroom one, and elsewhere.

---

8. A co-defendant, Louis Smith, was also convicted of various offenses but did not appeal.

9. All of the rocks purchased by both officers were later analyzed and found to be crack cocaine.

On top of the dresser in bedroom two, the police found two traffic tickets from the Metropolitan Police issued to Kevin Guishard at 1205 Harvard Street, N.W., a letter and another document [10] addressed to Braxton at 1205 Harvard Street, N.W., a birth certificate in the name of Steven Braxton, an identification card bearing Braxton's photograph and a New York address, and a small address book. Two medical bills and a letter, all addressed to Guishard at 1205 Harvard Street, were found in the living room.

Officer David Stroud testified as an expert about the methods used by drug dealers to prepare and package their drugs for distribution, describing the roles of "runners" and "holders" in a drug operation. He explained that drug dealers often use someone else's home as a site for their sales and hire the resident of that home to help run their business, rewarding that person with cash, drugs, a job in the operation, or a combination of the three. Stroud further testified that drug dealers often use weapons to protect their business and to keep their employees in line.

At the close of the government's case, counsel for all three defendants moved for a judgment of acquittal. The court denied the motions.

### B. *The Defense Evidence*

In his defense Braxton called only one witness, an attorney from the Public Defender Service, who testified that when he first met Braxton on the day after his arrest, there were noticeable designs shaved into the back of Braxton's hair.

Guishard presented the testimony of Mary Jefferson, who said that although Guishard sometimes stayed at 1012 Harvard Street (the site of the arrest), he occasionally used 1205 Harvard Street as a mailing address in emergencies, such as "when he has to go to the hospital." Jefferson herself lived at 1205 Harvard and knew appellant as a boy friend of her granddaughter, who was the mother of Guishard's child.

Guishard himself also testified. Although he admitted selling drugs to the undercover

officers, he denied any knowledge of the contraband seized from the apartment, including the pistol. He said that he was not a resident of 1012 Harvard Street but that he sometimes stayed there, as well as at 1205 Harvard Street, when he came from New York to Washington for a visit. He acknowledged that he had lived at 1012 Harvard Street from December 1990 to February 1991, but said that he did not keep any clothes in the bedroom closet there.

According to Guishard, on the day of his arrest he had come to Washington to take his son to a doctor's appointment. He testified that he was asleep and suddenly awoke when the undercover officers walked into the bedroom to purchase the drugs. He said he was "confused" and uncomfortable because he was shirtless in front of the two female officers, but he gave them what they wanted before going back to sleep. When he got up to use the bathroom a few minutes later, he had the bicycle pouch with him, but he denied placing the drugs in the toilet tank.

Avont Mosley, another resident of 1012 Harvard Street, testified for co-defendant Smith. According to Mosley, both Braxton and Guishard lived in the rear bedroom in the apartment at one time or another, and no one else stayed in that bedroom. Smith said he had lived in the apartment for seventeen years and slept in the living room. He testified that in mid-May 1991 Guishard was living in the bedroom, but as far as he knew, no one else was living with Guishard. He admitted, however, that Braxton had been staying there for "a couple of days" before May 15.

### II. SUFFICIENCY OF THE EVIDENCE OF CONSTRUCTIVE POSSESSION

Relying on *Curry v. United States,* 520 A.2d 255 (D.C.1987), both appellants contend that the evidence was insufficient to sustain their convictions. Braxton argues that the government failed to prove that he constructively possessed any of the seized articles and, in particular, that the evidence did not support his conviction of the armed offenses

---

10. This document was a notice to appear in court. To avoid any undue prejudice to Braxton, the government agreed to describe it as a document concerning "an important appointment."

under D.C.Code § 22–3202. More specifically, he maintains that the government failed to show the higher degree of control which, in his view, was necessary to establish that he committed the offenses "while armed with or having readily available" a weapon, and failed to show that it was foreseeable that Guishard would have a gun readily available. Guishard argues only that the evidence was insufficient to prove that he had constructive possession of the pistol.

■ At the outset we address Braxton's argument that our review of his claim of evidentiary insufficiency is limited to consideration of the government's evidence. Relying on *Cephus v. United States,* 117 U.S.App. D.C. 15, 324 F.2d 893 (1963), Braxton asserts that this court, when reviewing the sufficiency of the evidence in a multi-defendant case, cannot consider the testimony of a co-defendant if the appellant claiming insufficiency moved for a judgment of acquittal at the close of the government's case.

■ The general rule governing appellate review in a multi-defendant case is set forth in *Franey v. United States,* 382 A.2d 1019 (D.C.1978). We said in *Franey* that "a defendant who introduces evidence after the denial of his motion for a judgment of acquittal made at the close of the government's case thereby waives that motion and cannot make the ruling the subject of appellate review." *Id.* at 1021 (citations omitted). *Cephus* established a narrow exception to that rule. The court held in *Cephus* that "if the defendant himself rests on the Government's evidence, the co-defendant's testimony does not waive the defendant's motion." 117 U.S.App.D.C. at 19, 324 F.2d at 897 (footnote omitted). Contrary to Braxton's argument, however, *Cephus* does not govern here, for the *Cephus* exception is limited to cases in which one defendant's evidence is "introduced in response to" damaging testimony presented by a co-defendant. *Id.; see Dumas v. United States,* 483 A.2d 301, 304 (D.C.1984). Since Braxton presented his defense first, and not "in response to" the testimony of either Guishard or Smith, the *Cephus* exception to the general waiver rule

of *Franey* does not apply. In any event, we need not consider the finer points of Braxton's argument because we are satisfied that the government's evidence alone was sufficient to sustain his conviction. Although the co-defendants' evidence strengthened the government's case, it was not necessary to enable the jury to find Braxton guilty.

■ Thus our standard of review is the usual one, stated and restated in countless cases. We "must review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Curry v. United States, supra,* 520 A.2d at 263 (citations omitted); *accord, e.g., Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991) (citing cases).

■ To obtain a conviction based on a theory of constructive possession, the government must prove that the defendant knew of the location of the contraband, that he had the ability to exercise dominion and control over it, and that he "intended to guide [its] destiny." *Speight v. United States,* 599 A.2d 794, 796 (D.C.1991); *In re T.M.,* 577 A.2d 1149, 1151–1152 n. 5 (D.C.1990); *Bernard v. United States,* 575 A.2d 1191, 1195–1196 (D.C.1990). While the defendant's mere presence at the scene of the crime or proximity to the contraband does not by itself establish constructive possession, "proximity or association may establish a prima facie case of constructive possession if it is colored by evidence linking the accused to an ongoing criminal operation of which that possession is a part." *Curry, supra,* 520 A.2d at 263 (citations omitted).[11] If the contraband is seized from a residence which is occupied by more than one person, the government must also establish that the accused is more than a mere visitor to the premises and has a possessory interest in its contents. *Id.* at 264. Applying these principles to the facts of the instant case, we hold that the evidence was sufficient for a reasonable juror to find that both appellants constructively possessed the

11. The "ongoing criminal operation" in this case, of course, was the drug-selling business which both appellants conducted out of the bedroom in the Harvard Street apartment.

pistol as well as the other contraband found by the police.

Appellants rely primarily on *Curry* in arguing that the government failed to establish that they exercised dominion and control over the drugs, the gun, or any of the other contraband recovered from the apartment. They contend that, as in *Curry*, there was no evidence linking either of them to the apartment or its contents, and in particular that the evidence was insufficient to connect them to the gun in the dresser drawer, since the gun was not in plain view and there were no fingerprints on it. They maintain that generalized expert testimony about the use of weapons to protect a drug enterprise "does not permit a blanket inference" [12] that this particular gun belonged to either of them or was used in connection with their drug transactions.

Contrary to appellants' argument, *Curry* is distinguishable on its facts. In *Curry* we held that the government had failed to establish that a loaded gun found in a drawer in the bedroom was part of the drug operation or linked to the defendants. Significant to that decision, however, was the fact that the drug transactions did not take place in the room where the gun was recovered; in fact, none of the defendants were even seen in the bedroom where the gun was found. Furthermore, there were no drugs found near the gun, and there was no evidence, other than expert testimony, that linked the gun to the drugs.

In the instant case, by contrast, there was circumstantial evidence linking both appellants to the gun, as well as to the drugs and the other contraband found in the apartment. *See Earle v. United States,* 612 A.2d 1258, 1265–1266 (D.C.1992). The testimony of Officers Tillman and May clearly established that both appellants, along with their co-defendant Smith, were operating a drug business out of the rear bedroom at 1012 Harvard Street. The personal papers recovered from the bedroom and elsewhere, together with the testimony of Smith and Mosley, established that each appellant was at least a part-time resident of the apartment. Some of those papers were found on top of the dresser where the gun was also found in a top drawer. The gun, although not in plain view, was in close proximity to both appellants when they were selling drugs to the two undercover officers, and thus it can be linked to that illegal activity. The bedroom was small, and each appellant was just a few steps away from the dresser where the gun was located. "Evidence of proximity is sufficient to permit the jury to infer that appellants had convenient access and thus 'dominion and control' over the [gun]." *Logan v. United States,* 489 A.2d 485, 491 (D.C.1985) (citations omitted); *accord, Brown v. United States,* 546 A.2d 390, 395 (D.C.1988); *Johnson v. United States,* 309 A.2d 497, 499 (D.C. 1973), *cert. denied,* 416 U.S. 951, 94 S.Ct. 1960, 40 L.Ed.2d 301 (1974). We hold that the evidence was sufficient to establish that both appellants constructively possessed the gun as well as the drugs and the other contraband recovered from the apartment.[13]

### III. BRAXTON'S OTHER CONTENTIONS

#### A. "Readily Available"

■ In a related argument, Braxton claims that since the government failed to present sufficient evidence to establish that he had constructive possession of the pistol, the evidence was also insufficient to prove the "armed with or having readily available" element of D.C.Code § 22–3202.[14] Relying

---

12. *Curry, supra,* 520 A.2d at 265.

13. Both appellants also cite *United States v. Long,* 284 U.S.App.D.C. 405, 905 F.2d 1572, *cert. denied,* 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990), which held that the evidence was insufficient to show that the defendant had constructive possession of a partially exposed gun. *Long* is distinguishable from the instant case because in *Long,* unlike this case, there was no evidence linking the defendant to the premises. Furthermore, the court was construing the

phrase "uses or carries a firearm" in 18 U.S.C. § 924(c)(1), which is different from "readily available" in D.C.Code § 22–3202 and has been more narrowly construed. *See Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

14. D.C.Code § 22–3202 authorizes an enhanced sentence for any person who commits a crime of violence or dangerous crime "when armed with or having readily available any pistol or other firearm...."

on *Thomas v. United States,* 602 A.2d 647 (D.C.1992), Braxton urges us to hold that the phrase "readily available" in section 22–3202 requires the government to show that he had a "closer connection" to the pistol than is required to prove constructive possession under D.C.Code § 22–3204(b). In *Thomas* this court said:

> Proof that one had possession of a firearm does not necessarily establish that the firearm was readily available.... In short, possession is a broader concept than armed with/readily available. Thus, 3202 requires proof of a fact not required of 3204(b)....

*Id.* at 654 (citations omitted). We also stated that "[s]ection 3202 requires proof that the perpetrator exercised a degree of dominion and control not required for a conviction under 3204(b)." *Id.* at 655. Braxton maintains that the government failed to establish that he had this higher degree of control and that the trial court therefore erred in permitting the "while armed" charges (see notes 1 and 2, *supra*) to go to the jury.

▮▮▮▮ This court has not yet defined the term "readily available," but we have held that it includes an operable pistol lying on top of a television set "within [the defendant's] immediate reach." *Morton v. United States,* 620 A.2d 1338, 1340 (D.C.1993). Although the language in *Thomas* cited by appellant suggests that constructive possession and "readily available" are different concepts, they also overlap to some extent because, in order to have a weapon "readily available," one must at a minimum have constructive possession of it. We need not now explore the possible distinctions between the two concepts, since *Morton* compels us to hold that an operable pistol in a dresser drawer, just a few feet away from both appellants as they jointly engaged in a series of drug transactions, meets the definition of "readily available." We leave to a future case any attempt to set the outer limits of that definition.

## B. *Aiding and Abetting*

▮▮▮▮ Braxton also claims that he cannot be convicted of any armed offense as an aider and abettor of Guishard because the evidence was insufficient under *Thomas* to sustain Guishard's conviction as a principal. He argues in the alternative that even if the evidence was sufficient to prove Guishard's guilt of an armed offense as a principal, it was insufficient to show that Braxton could foresee that Guishard would be distributing the cocaine with a gun "readily available."

▮▮▮▮ It is firmly established in the District of Columbia that "[o]ne who aids and abets the principal in committing the crime is charged as a principal." *Tyler v. United States,* 495 A.2d 1180, 1182 (D.C.1985) (citing *inter alia* D.C.Code § 22–105).[15] However, in order to convict an aider and abettor of an armed offense which was committed only by the principal, the evidence must be sufficient to support an inference that the aider and abettor could reasonably foresee that the principal was armed or that a dangerous weapon was readily available. *Hordge v. United States,* 545 A.2d 1249, 1256 (D.C. 1988) ("it is sufficient if there is evidence to support a reasonable inference that the accomplice was aware the crime would be committed 'while armed'"); *see Ingram v. United States,* 592 A.2d 992, 1002–1003 (D.C.), *cert. denied,* 502 U.S. 1017, 112 S.Ct. 667, 116 L.Ed.2d 757 (1991). We need not decide whether the evidence against Braxton as an aider and abettor meets this test, because the evidence was sufficient independently to establish Braxton's guilt as a principal under D.C.Code § 22–3202. In part III–A of this opinion we have already held that Braxton's reliance on *Thomas* is misplaced and that the gun found in the dresser drawer was "readily available" to both Braxton and Guishard. Thus we hold that the evidence was sufficient to establish that both Braxton and Guishard were acting as principals, and we need not reach the issue of whether, as an aider and abettor, Braxton could foresee that the gun was readily available.

---

**15.** D.C.Code § 22–105 (1989)' provides in pertinent part:

> In prosecutions for any criminal offense all persons ... aiding or abetting the principal offender, shall be charged as principals and .not as accessories....

## C. *Jury Instructions*

We next address Braxton's argument that the trial court erred in failing to instruct the jury on foreseeability in the context of aiding and abetting and in failing to define the "while armed" component of D.C.Code § 22–3202.

 Although the government concedes that the trial court erred in omitting a foreseeability instruction, it argues that the omission does not require reversal because the evidence was sufficient to convict Braxton as a principal. We agree. In *Ingram* this court recognized that "in order to receive the enhanced penalties applicable to a [crime] 'when armed,' D.C.Code § 22–3202, the defendant is entitled to a 'reasonably foreseeable' weapon instruction...." 592 A.2d at 1004. We also held in *Ingram*, however, that there was no plain error because the instructions actually given were "sufficiently complete" and were coupled with a record that supported a finding of aiding and abetting under *Hordge. Id.* We reach a similar conclusion here. We hold that there was no plain error [16] because the instructions were "sufficiently complete" and because, in any event, the evidence was sufficient to permit the jury reasonably to find that both Braxton and Guishard were acting as principals. *See Butler v. United States,* 614 A.2d 875, 886–887 (D.C.), *cert. denied,* 506 U.S. 1009, 113 S.Ct. 625, 121 L.Ed.2d 558 (1992) (instruction applicable only to aiders and abettors need not be given when evidence shows that defendant was a principal).

 Braxton's claim that the trial court erred in failing to define "readily available" is also without merit. A trial court is under no obligation to define particular terms in its jury instructions, nor does it have a "general duty to instruct the jury *sua sponte.*" *Allen v. United States,* 495 A.2d 1145, 1150 (D.C.1985) (en banc); *see also, e.g., Curington v. United States,* 621 A.2d 819, 821–822 (D.C.1993) (no plain error in

court's failure to instruct the jury on statutory definition of an element of the offense). Braxton's trial counsel submitted to the court several proposed jury instructions based on the standard "red book" [17] and on the language of the statute. Later the instructions to be given were discussed at length by all concerned, and the court asked counsel whether they wished to offer any corrections or additions. Braxton's counsel never requested a definition of "armed with or having readily available," although he had ample opportunity to do so. Since Braxton failed to preserve this issue for appeal, we review his claim only for plain error, *see Allen, supra,* 495 A.2d at 1151–1152, and hold that he has failed to show that omission of the instruction rose to the level of a "miscarriage of justice." *Watts v. United States, supra* note 16, 362 A.2d at 709; *see also Carter v. United States,* 591 A.2d 233, 234 (D.C.1991) ("a statute should be construed according to the ordinary meaning of the words" (citation omitted)).

## D. *Cross-examination*

 Braxton maintains that the trial court erred in admitting certain evidence which he claims unfairly prejudiced his case. The government, on cross-examination of Guishard, was allowed to elicit evidence of his relationship with Braxton and their connection to New York. Braxton now claims that this testimony portrayed him as an "incorrigible, dangerous and long-time New York drug dealer." He also contends that the court erred in denying his request for a mistrial after the government elicited information about his prior incarceration.

On direct examination Guishard testified that he was from New York and that he had traveled to Washington with his girl friend, his infant son, and Braxton. Counsel for Braxton opposed the admission of any evidence that would connect his client to New York, claiming that it was irrelevant and

**16.** We agree with the government that the plain error rule applies here because defense counsel did not request, or even discuss the need for, a foreseeability instruction. *See Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc) (defining plain error); Super.Ct.Crim.R. 30 (re-

quiring specific objection to any omission of a requested instruction).

**17.** CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA (3d ed. 1978); *see Tibbs v. United States,* 507 A.2d 141, 144 n. 3 (D.C.1986).

prejudicial. The court overruled his objection, ruling that the probative value of such evidence outweighed its potential for prejudice. Thereafter Guishard testified on cross-examination that he knew Braxton from New York and that they had traveled several times to Washington together. The prosecutor then asked a series of questions which implied that the two men were bringing drugs to Washington from New York and selling them out of a rented room.[18]

We reject Braxton's argument that the testimony about his travels between New York and Washington was prejudicial because it portrayed him as a drug dealer. We find nothing in the record which would lead the jury to conclude that appellants were drug dealers simply because they came from New York. As the government persuasively argues, the same questions could have been posed had appellants been traveling back and forth between Washington and Pittsburgh. We agree with the government that it was reasonable to question why Guishard "was shuttling back and forth between New York and Washington," and why he was not staying with his girl friend at 1205 Harvard Street but merely used that address for his

mail, staying in another apartment only two blocks away, at 1012 Harvard Street, "that contained an abundance of drugs, a weapon, and ammunition." Moreover, the prosecutor had a factual basis for asking the questions, since there was conflicting testimony about whether Braxton lived at 1012 Harvard Street, and the prosecutor's questions sought to explore the connection between Guishard and Braxton. *See Carter v. United States*, 614 A.2d 913, 918 (D.C.1992) (stating "general rule that a cross-examiner must have some sort of factual predicate for a potentially prejudicial question"). Braxton and Guishard both testified that Braxton did not live in the apartment; Mosley, however, testified that both men did live there. Thus it was not unreasonable for the prosecutor to ask Guishard about his travels with Braxton between New York and Washington.[19]

Furthermore, the prosecutor was entitled to frame questions by drawing inferences from earlier testimony that would support his theory of the case. *See Scott v. United States*, 619 A.2d 917, 924 (D.C.1993). Since there was already evidence before the jury that Braxton and Guishard were selling

---

18. On cross-examination Guishard testified:

Q. Well, isn't it true that there were more drugs in this bag and that your stash of drugs that you brought down with you from New York was in this black pouch that day?
A. I didn't bring no drugs from New York, sir.

\* \* \* \* \* \*

Q. Isn't it true that you and [Braxton] together owned the stash of drugs that was in this black pouch on May 15th, 1991?
A. No, sir.
Q. Isn't it true that Steven Braxton, your co-defendant in this case, was your partner in drug dealing on May 5th, on May 15th at 1012 Harvard Street?
A. No, sir.
Q. Isn't it true that you paid Louis Smith to use his apartment to sell drugs out of when you were down here in D.C.?
A. No, sir.
Q. Isn't it true that when you were down here you paid him to use his bedroom so that he would sleep in the living room?
A. No, sir.
Q. Mr. Guishard, Steven Braxton as of May 15th, 1991, was a good friend of yours, wasn't he?
A. Yeah, he was a friend of mine.

Q. He was somebody you knew well both here and, and at home where you're from, isn't that right?
A. Yeah, I knew him from New York.
Q. And you'd come down here on more than one occasion with Mr. Braxton, isn't that right?
A. Yes, sir.

\* \* \* \* \* \*

Q. ... Government's Exhibit 11, Mr. Guishard, and Government's Exhibit 31, Exhibit 11, the gun, you brought this down with you from New York to protect your drugs on May 15th, didn't you?
A. No, sir.
Q. You had it down here already as of May 15th?
A. No, sir.

19. Braxton's reliance on *United States v. Doe*, 284 U.S.App.D.C. 199, 903 F.2d 16 (1990), is misplaced. In *Doe* the court held that expert testimony focusing on the monopolization of the local drug market by Jamaicans, which strongly suggested that the appellants were guilty because two of them were from Jamaica, was irrelevant. This case is distinguishable since questions regarding Guishard's travels between New York and Washington were relevant to establish his connection, and hence Braxton's as well, with the apartment where the drug sales took place.

drugs together and that they had traveled several times together between New York and Washington, it was not improper for the prosecutor to draw the inference that they had brought the drugs from New York to sell in Washington.

 Braxton also argues that the trial court abused its discretion by permitting the prosecutor to pursue a line of questioning during his cross-examination of co-defendant Smith in which it was revealed that Braxton had previously been incarcerated. When the prosecutor asked Smith if he had ever seen the officers in the neighborhood before, Smith replied:

> [The officer] ... asked where [was] the fellow with the scar on [his] face. And I thought about it.... I said, he's not in the house, you all know you got him in jail.

Since Braxton was "the fellow with the scar on his face," his counsel immediately objected and moved for a mistrial. The court denied the motion, but instructed the jury that the defendants were on trial only for what occurred on May 15, 1991.

Although the prosecutor's question gave rise to an apparently spontaneous comment about Braxton's previous incarceration, the record satisfies us that the question was asked in good faith and that the prosecutor had no idea that the witness would answer in the way he did. Moreover, the comment was not substantially prejudicial, since there was already evidence that Braxton was involved in selling drugs, and the court gave a curative instruction to minimize any potential prejudice. *See Scott v. United States, supra,* 619 A.2d at 925–927 (reversal not warranted when court gave prompt curative instruction and defendant was not substantially prejudiced by the questioning). We conclude that neither this comment nor the prosecutor's questions connecting appellants to New York were sufficiently prejudicial to warrant a mistrial. *See Rambert v. United States,* 602 A.2d 1117, 1120 (D.C.1992) (denial of motion for mistrial will be disturbed only in "extreme situations threatening a miscarriage of justice").

### E. *Disclosure of the Informant's Identity*

 Finally, Braxton argues that the trial court erred by not disclosing the identity of an informant whose information served as the basis for the search warrant. Braxton asserts that the informant's testimony was essential to show that he was merely a visitor, not a resident of the apartment, and that the trial court should have held an *in camera* hearing to determine what the informant's testimony would be.

 Although in general the government is privileged to withhold the identity of an informant who gives information to law enforcement officers about violations of the law, this privilege must occasionally give way when the identification of an informant is essential to a fair trial. *Roviaro v. United States,* 353 U.S. 53, 59–61, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1957). Nevertheless, we will overturn a trial court's denial of a request for disclosure of an informant only for an abuse of discretion. *United States v. Lyons,* 448 A.2d 872, 875 n. 6 (D.C.1982) (citing cases). Relying on *Roviaro,* Braxton claims that there was such an abuse in this case because the informant's testimony was material to his defense. This claim is without merit.

 There is no indication in the record that revealing the identity of the informant was essential to a fair trial for either appellant. In *Roviaro,* unlike this case, the informant was the sole participant in the transaction and, aside from the police officers, was the only witness. By contrast, in the instant case, the informant was neither a participant nor a witness to the undercover sales but merely a person who had purchased drugs at 1012 Harvard Street approximately three days earlier. "Mere speculation that the informer might possibly be of some assistance is not sufficient to overcome the public interest in the protection of the informer." *Lannom v. United States,* 381 F.2d 858, 861 (9th Cir.1967), *cert. denied,* 389 U.S. 1041, 88 S.Ct. 784, 19 L.Ed.2d 833 (1968). "The burden is on the person seeking disclosure to demonstrate that the informer is not merely an informer but rather a participant, an eyewitness, or someone who could give direct testimony on the events at issue." *United*

States v. Lyons, supra, 448 A.2d at 874. We hold that Braxton did not meet that burden, see Hamilton v. United States, 395 A.2d 24, 27 (D.C.1978), and thus that the trial court did not abuse its discretion in refusing to disclose the identity of the informant.

## IV. GUISHARD'S OTHER CONTENTION

■■■ Guishard claims that certain statements made by the prosecutor during closing argument mischaracterized him as a man with an "attitude towards women." He argues that these comments were prejudicial and inflammatory and that the court committed reversible error in overruling his objection to them.

In his summation the prosecutor argued that the gun was in the dresser drawer, not on the person of either appellant, because both men were shirtless [20] and believed they had nothing to fear in making a sale to two women. Elaborating on this theory, the prosecutor reminded the jury of Guishard's own testimony, in which he said several times that he had just awakened from a nap and felt uncomfortable being without a shirt in the women's presence. Guishard further stated that the arresting officer (also female) was watching him use the bathroom before she announced her presence. The prosecutor suggested that Guishard's comments were not logical but merely reflected his "attitude towards women."

■■■ In reviewing claims of improper comment by a prosecutor during closing argument, we must first consider whether the comment was improper. McGrier v. United States, 597 A.2d 36, 41 (D.C.1991) (citing cases). If we conclude that it was, we must then decide whether it resulted in "substantial prejudice." Scott v. United States, supra, 619 A.2d at 924; McGrier, supra, 597 A.2d at 41. The test for determining "substantial prejudice" is:

> whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive

factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.

Gaither v. United States, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (citation and footnotes omitted).

■■■ We find no impropriety in the prosecutor's remarks in this case. A prosecutor may argue all reasonable inferences from the evidence, Jones v. United States, 512 A.2d 253, 257 (D.C.1986) (citing cases), and we need not assume that the jury drew the most damaging inference from what the prosecutor said. See Donnelly v. DeChristoforo, 416 U.S. 637, 646–647, 94 S.Ct. 1868, 1872–1873, 40 L.Ed.2d 431 (1974). Moreover, even if we were to find that the prosecutor's remarks were improper, they do not meet the "substantial prejudice" test articulated in Gaither, supra, and consistently applied by this court in such cases as Scott and McGrier. The prosecutor's remark about Guishard's "attitude," even if we assume it was improper, was only a fleeting comment in a lengthy eight-day trial. Viewing it in the context of the whole record and in light of the government's strong evidence of guilt, we deem it "too trivial to worry about." Scott, supra, 619 A.2d at 929.

## V

For the foregoing reasons, the convictions of both appellants are

Affirmed.

■■■■■■■■

---

20. The prosecutor suggested that because neither appellant was wearing a shirt, the sight of a gun "sticking out of their pants" might discourage a potential customer from buying drugs.