David B. JACKSON, Appellant

v.

UNITED STATES, Appellee.

No. 11–CM–1322.

District of Columbia Court of Appeals.

Submitted Oct. 18, 2012.

Decided March 7, 2013.

Stephen W. Riddell, Atlanta, for appellant.

Uma M. Amuluru, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and EASTERLY, Associate Judges, and NEBEKER, Senior Judge.

EASTERLY, Associate Judge:

Appellant David Jackson challenges his conviction for possession with intent to distribute a controlled substance (marijuana) under D.C.Code § 48–904.01(a)(1) (2001 & Supp.2011). The drugs in question were discovered in a closed cooler on the floorboard behind the driver's seat of Mr. Jackson's co-defendant's car. When the police arrived at the scene, Mr. Jackson was seated in the backseat of the car on the passenger's side. Mr. Jackson argues that the fact that he was briefly observed "just sitting" in the car, near the drugs, is not enough to establish his constructive possession of the drugs beyond a reasonable doubt. We agree.

This court, in *Rivas v. United States,* 783 A.2d 125 (D.C.2001) (en banc), reaffirmed its commitment to the requirement that guilt be proved beyond a reasonable doubt in constructive possession cases. *Rivas* held that to prove beyond a reasonable doubt a defendant's intent to exercise dominion or control over contraband—an essential element of constructive possession—the government must present evidence of "something more" than mere proximity. *Id.* at 130. But, in this case, evidence of proximity was all that was presented.

The police officers' momentary observation of Mr. Jackson's inactive presence in the car gave rise to numerous possible inculpatory inferences but did not connect to any other evidence so as to support a narrative of constructive possession. Instead, Mr. Jackson's ambiguous presence in the car potentially connected to any number of unknown facts demonstrating that he was simply in the wrong place at the wrong time. Absent other evidence linking Mr. Jackson to the drugs—*e.g.,* evidence indicating when or why he entered the car, or what his relationship was to his co-defendant—a trier of fact would be unable to determine beyond a reasonable doubt that Mr. Jackson had the requisite guilty intent and "was not just an innocent bystander" to illegal activity. *Id.* at 128. Accordingly, pursuant to *Rivas,* the evidence against Mr. Jackson was legally insufficient to sustain a conviction for possession with intent to distribute marijuana.

## I. Facts

Mr. Jackson initially came to the attention of the police on the afternoon of June 16, 2011, the date of the charged offense, because his co-defendant, Charles Winfield, was on the street, drinking a beer. Metropolitan Police Officer Stephen Stanford testified that, when he drove onto the 5100 block of Bass Place Southeast, he noticed Mr. Winfield, who was standing with "a young lady." Officer Stanford exited his car and, after confirming that Mr. Winfield was holding an open container of alcohol, called his partner, Officer Jason Newman, who was driving in a separate vehicle, for assistance.

At that point, Officer Stanford "looked across the street[1] and saw a Dodge Mag-

1. Officer Newman testified that Bass Place is "a two-way road, but it's not divided by any

num ... that was occupied by someone in the rear seat." [2] This person was "not doing anything illegal"; he was "just sitting." Officer Stanford asked Mr. Winfield if the Dodge Magnum was his, "because it was running and [Mr. Winfield] was not too far from it." Mr. Winfield acknowledged ownership and gave his consent to Officer Stanford to search the car. Meanwhile, Officer Newman arrived and went to speak to the person in the car, Mr. Jackson.

Officer Newman testified that Mr. Jackson was "in the rear passenger seat right behind the front passenger seat." While Mr. Jackson was still seated in the car, Officer Newman asked for his name, date of birth, and address. The record does not reflect how they were able to communicate, *i.e.*, whether any windows were rolled down or any doors were opened. Officer Newman testified that Mr. Jackson was "cooperative" and, at that point, Officer Newman did not notice "anything." Officer Newman "then asked Mr. Jackson to step out of the vehicle" so he could begin his search.

"[A]s soon as [Officer Newman] entered the rear of that vehicle, [he] started smelling a strong odor of unburned marijuana." [3] Officer Newman testified that he then "noticed a purple cooler that was sitting on the floorboard, right behind the driver's seat in the rear part of the vehicle." The cooler was small, the type a person would take "to a ball game" or "use

to take ... lunch in." Officer Newman testified that "[a]s soon as I picked that purple cooler up, the smell of unburned marijuana got much stronger." Officer Newman opened the cooler and "found two large bags." Inside one bag were "11 individually packaged sandwich bags containing—all containing a green weed-like substance." Inside the other bag "was a vacuum sealed bag containing a green weed-like substance." The cooler also contained "multiple empty sandwich bags and a scale." Upon making this discovery, Officer Newman and Officer Stanford placed Mr. Jackson and Mr. Winfield under arrest. The contents of the cooler were later confirmed to be marijuana.

Officer Newman acknowledged that when he first saw the cooler, the "[t]op was closed." Officer Newman also testified that he "never witnessed Mr. Jackson try to show any sort of authority over the cooler" and he "never saw him move toward the cooler." Officer Newman admitted that the only reason he arrested Mr. Jackson was because "[h]e was very close to the cooler."

Beyond Officer Stanford and Officer Newman's testimony placing Mr. Jackson in the car when the officers arrived at the scene, the only other evidence the government presented at trial was testimony from two expert witnesses. Yvette Johnson, a forensic chemist from the Drug Enforcement Agency, opined that the sub-

---

lines in the middle of the road or anything like that. It's just a basic neighborhood road."

2. Officer Stanford inconsistently testified that he observed this individual—Mr. Jackson—"when I pulled into the block." Whether he noticed the car with Mr. Jackson in it right before or just after he spoke to Mr. Winfield makes little difference; either way, the record establishes that Officer Stanford's opportunity to view Mr. Jackson was brief.

3. In making its findings, the trial court recalled that Officer Newman had smelled the drugs earlier—that he had "testified that his attention was drawn to the vehicle by a smell [of the later discovered drugs]" and that "he was aware of the smell from outside the vehicle." But this was not Officer Newman's testimony.

stance in the cooler was marijuana. Detective George Thomas, an MPD "resident narcotics expert," opined that the drugs were packaged as if for sale; he also explained generally that drugs could be sold from cars, and that individuals selling drugs together could divide up the work and one person could find buyers or other sellers to distribute the drugs while another could hold on to the drugs and actually make the sales.

In rendering its verdict, the trial court acknowledged that it was a "circumstantial case," but, focusing on the amount of drugs and its packaging, it determined that the evidence was sufficient to find Mr. Jackson guilty of possession with intent to distribute marijuana.

## II. Analysis

 To uphold Mr. Jackson's conviction against a sufficiency challenge, this court must determine whether a rational fact-finder could find that all three elements of constructive possession—knowledge, the ability to exercise dominion or control, and the intent to do so [4]—were proven beyond a reasonable doubt. As we explained in *Rivas*, we consider the evidence in the light most favorable to the government and assess whether " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,' " *id.* at 134 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)), but this "does not mean that appellate review of sufficiency of the evidence is toothless," *id.* Rather, "[w]e have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a [fact-finder] behaving

rationally really could find it persuasive beyond a reasonable doubt." *Id.; see also Hutchinson v. United States*, 944 A.2d 491, 493 n. 2 (D.C.2008) (quoting *Rivas*, 783 A.2d at 134).

Mr. Jackson concedes that, based on his position in the back seat of Mr. Winfield's car, the evidence was sufficient to establish his ability to exercise dominion or control over the drugs, also in the back seat. But he argues that the government failed to present sufficient evidence that he both knew the cooler contained drugs and intended to exercise dominion or control over them.[5] We do not address the sufficiency of the evidence regarding Mr. Jackson's knowledge of the precise location of the drugs because we conclude that the case against Mr. Jackson fell short on the element of intent.

This court carefully analyzed the intent element of constructive possession in *Rivas*, and, as in *Rivas*, we find that this case turns on "whether the [fact-finder] rationally could find beyond a reasonable doubt that [Mr. Jackson] *intended* to exercise ... power [over the drugs], in other words, that he in fact 'had a substantial voice vis-à-vis the drugs.' " *Rivas*, 783 A.2d at 130 (brackets removed) (quoting *United States v. Staten*, 581 F.2d 878, 884 (D.C.Cir.1978)).

 "[Q]uestions of intent almost by definition can be determined only by resort to circumstantial evidence." *Jones v. United States*, 716 A.2d 160, 166 (D.C. 1998) (citing *Shelton v. United States*, 505 A.2d 767, 770 (D.C.1986)). But *Rivas* instructs us that, to satisfy the intent element of constructive possession, this cir-

---

4. *Rivas*, 783 A.2d at 129.

5. Mr. Jackson has not challenged the sufficiency of the evidence regarding the distribution element of the PWID charge and has

effectively conceded that if evidence of constructive possession is sufficient, that his intent to distribute the drugs could be inferred from their packaging.

cumstantial evidence may not amount to proximity alone: " '[M]ere presence of the accused on the premises, or simply his proximity to the drug, does not itself enable ... a deduction' beyond a reasonable doubt that he had the requisite intent." 783 A.2d at 130 (quoting *Staten*, 581 F.2d at 884). Indeed, *Rivas* reaffirmed this rule and rejected a special exception that had permitted the government to rely solely on physical proximity in the close confines of a car to establish intent to exercise dominion or control over contraband. *Id.* at 131.

█ Thus we held in *Rivas* that, in car cases as in all others, "there must be something more in the totality of the circumstances that—together with proximity and knowledge—establishes that the accused meant to exercise dominion or control over the narcotics." *Id.* at 130. Specifically, " '[t]here must be some action, some word, or some conduct that links the individual to the narcotics and indicates that he had some stake in them, some power over them. There must be something to prove that the individual was not merely an incidental bystander.' " *Id.* (quoting *United States v. Pardo*, 636 F.2d 535, 549 (D.C.Cir.1980)); *see also id.* at 146 (Ruiz, J., concurring) (noting that our case law has identified "many such 'plus factors' " including "evidence linking the accused to an ongoing criminal operation of which possession is a part, attempts to hide or destroy evidence, other acts evincing consciousness of guilt such as flight, and evidence of prior possession of contraband" (footnotes omitted)). In so holding, we expressly stated that our object was to exclude those who perhaps " 'foolish[ly] ... stand by when others are acting illegally, or ... associate with those who have committed a crime' " because "[s]uch conduct or association, ... *without more*, does not establish" constructive possession of

contraband. *Id.* at 130 (majority opinion) (quoting *Pardo*, 636 F.2d at 549).

Applying this standard in *Rivas*, this court found the evidence of intent wanting. There, the police saw a car stopped in the middle of the street at 1:00 a.m. *Id.* at 128. Just after the police drove up behind the car, Mr. Rivas stepped out from the front passenger street, leaving his door open. *Id.* Mr. Rivas went over to the sidewalk and "engaged another man in conversation," while the car from which Mr. Rivas had alighted pulled over to the curb. *Id.* The police then approached; as they did so, Mr. Rivas walked around the corner where he was subsequently apprehended. *Id.* at 128–29. Inside the car, the police saw in plain view "two plastic bags containing a visible white rock substance [later confirmed to be crack cocaine] in the console between the two front seats." *Id.* at 129.

In reviewing this evidence, this court observed that "it has the quality of a snapshot—a frozen instant in time and space, crystalized but devoid of explanatory context." *Id.* at 134. We noted that two bags of cocaine "worth a few hundred dollars on the street" were found next to where Mr. Rivas "had just been seen sitting," but that "there was no evidence as to how long [Mr.] Rivas had been in the car, how he had come to be there, or what he had been doing." *Id.* We further observed that "[t]here was no evidence that the occupants of the car were actively engaged in distributing drugs or preparing them for distribution when [Mr.] Rivas was present" and that, "[w]hen the police arrived, [Mr.] Rivas made no gestures toward the drugs and did not signal in any other way an intent to hide or dispose of them." *Id.* at 134–35. Finally, we noted that "[n]o other evidence was presented that linked [Mr.] Rivas to the cocaine." *Id.* at 135. Examining the totality of the government's evi-

dence, we held that this was not enough to prove guilt beyond a reasonable doubt. We observed that "an innocent person in [Mr.] Rivas's shoes might have acted exactly as he did when the police arrived" and that, "[o]n the issue of whether he exercised his control over the cocaine, [Mr.] Rivas's actions were insolubly ambiguous." *Id.* at 137.

■ Like *Rivas,* the evidence in this case is another snapshot in time, insufficient to sustain a determination beyond a reasonable doubt that Mr. Jackson intended to have control over the marijuana in the closed cooler. The police observations of his actions were limited and unilluminating. When the police drove into the 5100 block of Bass Place, Mr. Jackson was "just sitting" in Mr. Winfield's car. There is no evidence indicating how long Mr. Jackson "had been in the car, how he had come to be there, or what he was doing" there. *See Rivas,* 783 A.2d at 134. And Mr. Jackson did not take any action after the police arrived to connect himself to the drugs or to provide evidence of an intent to maintain control over them. There was no testimony that he tried to hide or discard the drugs. Officer Stanford, who first saw Mr. Jackson, confirmed that Mr. Jackson "wasn't doing anything illegal." Officer Newman, who briefly questioned Mr. Jackson in the car, testified that he "never witnessed Mr. Jackson try to show any sort of authority over the cooler" and that he "never saw him move toward the cooler."

Moreover, the police developed no other evidence through interviews or investigation to prove Mr. Jackson's intent to exercise dominion or control over the drugs. The government presented no "incriminating evidence ... taken from [Mr. Jackson's] person," nor any forensic evidence indicating that Mr. Jackson "had ever handled the bags" of marijuana, much less

touched the cooler. *See Rivas,* 783 A.2d at 129; *see also James v. United States,* 39 A.3d 1262, 1270 (D.C.2012) (noting that the government offered no evidence "that a fingerprint expert [had] lifted Mr. James's fingerprint from one of the Ziploc bags found in his car"). It appears neither Mr. Jackson nor Mr. Winfield ever said anything inculpating. Officer Newman testified that he only asked Mr. Jackson for his identifying information. Mr. Jackson was "cooperative," and Officer Newman did not notice "anything" to raise his suspicions regarding Mr. Jackson. Officer Newman admitted that the only reason he ended up arresting Mr. Jackson was because of his proximity to the cooler.

The government argues, however, that its evidence was sufficient and that *Rivas* is distinguishable both because of the "circumstances surrounding appellant's position in the car"—namely that Mr. Jackson was "the only person sitting next to a large quantity of drugs packaged for distribution"—and because it "presented evidence to show the existence of an 'ongoing criminal operation.'" The first argument reduces to a reliance on knowledge and proximity and is foreclosed by *Rivas* and its progeny; the second is unsupported by the record.

We turn first to the "circumstances surrounding appellant's position in the car," and begin by acknowledging, as we did in *Rivas,* that proximity to and knowledge of drugs is plainly relevant to intent, 783 A.2d at 131, and may support inferences of intent. But we stand fast to our holding in *Rivas* that these inferences cannot alone support a showing of guilty intent beyond a reasonable doubt. *Id.* at 133–37 (evaluating the government's evidence and acknowledging that "Rivas's immediate proximity to unconcealed drugs in an automobile, certainly ... ma[d]e it more probable that he possessed the drugs.... [but]

did not by itself prove beyond a reasonable doubt that he" constructively possessed them); *id.* at 139 (Ruiz, J., concurring) ("As the majority notes, in this case we are not concerned with the question of reasonableness of the inference of intent that may be derived from the proximity of a defendant to contraband in plain view, but rather with the sufficiency of the evidence necessary to prove such an inference beyond a reasonable doubt."). The government draws a number of inferences from Mr. Jackson's presence and position in the car and his inferred knowledge of the marijuana in the cooler, but " 'when stripped to its essence,' " *see id.* at 142 (brackets removed) (quoting *In re T.M.,* 577 A.2d 1149, 1154 (D.C.1990)), the case against Mr. Jackson rested solely on proximity and knowledge and lacked the "something more in the totality of circumstances," *id.* at 128 (majority opinion), necessary to sustain a conviction.

■ Specifically, the government emphasizes that, unlike in *Rivas,* no one other than Mr. Jackson was seen in the car and he "remained in the car ... when [Mr.] Winfield left ... to have a beer outside," seated in a location that was "unnatural under the circumstances," next to a cooler full of drugs and drug paraphernalia. Preliminarily, we reject any suggestion that *Rivas* has no application since no other people were actually in the car with Mr. Jackson and the drugs. The rule of *Rivas*—requiring something more than proximity to contraband to establish constructive possession—is not limited to situations when others are contemporaneously present; the question is whether other people are around or have access to the contraband. *See, e.g., James,* 39 A.3d at 1270–71 (requiring "something more in the totality of circumstances" to prove constructive possession of drugs found in defendant's car where defendant admitted he owned the car and had driven it the day it was seized by the police but had left it unlocked on the street for several hours); *see also Rivas,* 783 A.2d at 144–45 (Ruiz, J., concurring) ("Absent additional evidence that proximity is probative of intent in the totality of the circumstances of a defendant's situation, in the ambiguous situation involving more than one person with access to contraband, physical proximity alone is insufficient to establish the intent element of constructive possession beyond a reasonable doubt."). Here, the record reflects that there were *other people near- by,* namely Mr. Winfield, the owner of the car, and his female companion.

Moreover, the government's argument that Mr. Jackson "remained" in the car and had exclusive possession over the car and its contents strays from the record. There is no evidence as to when Mr. Jackson entered Mr. Winfield's car and thus no evidence that he was seated in the car before Mr. Winfield exited it. Similarly, the government's representation that Mr. Winfield "left appellant alone" in the car and that Mr. Jackson had exclusive control of Mr. Winfield's car is unsupported. Officers Newman and Stanford testified that Mr. Winfield was standing just across the street from his car, which he had left running.[6] Even if we accept the characterization that Mr. Jackson "remained" in

---

**6.** To the extent that the government relies on *Olafisoye v. United States,* 857 A.2d 1078 (D.C.2004) to say that Mr. Jackson had exclusive possession of the car or the drugs, from which culpable intent may be inferred, the facts in this case are distinguishable. There, the defendant was seen driving the car containing contraband with no passengers "just moments before his arrest," "witnesses testified they saw him drive [the same car] on previous occasions," and he never told the arresting officers that the car belonged to someone else. *Id.* at 1087.

the car after the police arrived, "that action—or rather inaction" is no more incriminating than "the conduct the court found too speculative to support an inference of culpable intent in *Rivas*, where the passenger affirmatively got out of the car and walked away as the police approached." *Hutchinson*, 944 A.2d at 493–94.

We disagree that Mr. Jackson's presence in the car and selection (whenever he entered the car) of the backseat as opposed to the front passenger seat supports beyond a reasonable doubt an inference of intent to exercise control over the cooler containing the drugs. The record is silent regarding the reason Mr. Jackson got in Mr. Winfield's car. There is no evidence indicating the nature of the relationship between the two men or whether they had a relationship at all. Mr. Jackson might have entered the car to engage in drug dealing, but it is equally plausible that he got in the car because he had asked for a ride or been offered one by Mr. Winfield or his female companion.[7] Like Officer Newman, Mr. Jackson may not have smelled the odor emanating from the cooler before he entered the car.[8] Even if he smelled the drugs once seated, he may nonetheless have decided to stay without endorsing, or indicating a desire to participate in, illegal activity.[9] As for why Mr. Jackson might have sat in the backseat, there are any number of reasons: Mr. Winfield might have instructed him to do so, or he might have believed that that the front passenger seat had been or would be occupied by Mr. Winfield's female companion. The myriad questions left unanswered by Mr. Jackson's presence in the car and position next to the cooler containing the drugs is the reason we do not allow intent to be founded on proximity to contraband alone.[10] "In these circumstances,

---

7. The government argues that there is no evidence supporting these possible explanations, but its explanation—that Mr. Jackson must have entered the car and chosen to sit in the back seat with the drugs to maintain control over them—is equally speculative. *See James*, 39 A.3d at 1269 (" 'evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation' " (quoting *In re M.L.*, 24 A.3d 63, 67 (D.C.2011))). As the party with the burden of proof, the government had the obligation to establish beyond a reasonable doubt that Mr. Jackson was not a mere visitor in the car. *See Rivas*, 783 A.2d at 144 (Ruiz, J., concurring) (" 'If the contraband is seized from a residence which is occupied by more than one person, the government must also establish that the accused is more than a mere visitor to the premises....' " (alteration in original) (quoting *Braxton v. United States*, 669 A.2d 1306, 1312 (D.C.1995))).

8. *See Rivas*, 783 A.2d at 135 (observing that "[p]erhaps ... Rivas accepted a ride ... not knowing there were drugs present until some time after he got in the car").

9. As we explained in *Rivas*,

People offer or accept rides from colleagues or acquaintances solely because they are travelling to a common destination. We might pick someone up in bad weather, merely recognizing them as a neighbor. We arrange car pools, and drive people home from parties knowing only that we have friends in common. In all these circumstances, we find ourselves in cars with people whom we might never have occasion to invite into the privacy of our own homes.

783 A.2d at 131. Moreover, as explained in the concurrence in *Rivas*, "a person's living conditions, relatives and friends may not permit the luxury of safe distance from criminal behavior in a crowded, harsh and sometimes inescapable urban environment." *Id.* at 145 (Ruiz, J., concurring).

10. The government relies on *Smith v. United States*, 899 A.2d 119 (D.C.2006), and *Parker v. United States*, 601 A.2d 45 (D.C.1991), to support its assertion that Mr. Jackson's seat selection was proof of guilty intent. *Smith* "is a very different case," however; there, the defendant used his position in the front passenger seat of the car to hide the drugs by using his knees "to hold the [glove compartment]

at least, any superior control [Mr. Jackson] had over the drugs did not relieve the government of the need to show the additional evidence of intent that *Rivas* requires." *Hutchinson,* 944 A.2d at 494.

Similarly, we reject any attempt to prove Mr. Jackson's intent by reference to the amount of drugs discovered and the presence of packaging paraphernalia. These items were not visible; they were in a closed cooler, the kind one might take to a ballgame or use to carry one's lunch. Even if a fact finder could infer that Mr. Jackson was aware that some amount of marijuana was in the cooler from its smell, there is no evidence that Mr. Jackson ever opened the cooler or observed its contents. In any event, "the proper measure is not whether a person is in the presence of drugs sufficient to sustain a conviction for distribution." *Rivas,* 783 A.2d at 147 (Ruiz, J., concurring). There must be something more to indicate that the accused is participating in an ongoing criminal operation. *Id.* at 134 (majority opinion) (finding evidence insufficient even though "two bags of cocaine, worth a few hundred dollars on the street, [were] lying exposed to view" where "[t]here was no evidence the occupants of the car were *actively engaged* in distributing drugs" (emphasis added)).

The government asserts that it did present such evidence, but we see none on this record. To be sure, there was evidence that the drugs were packaged as if for sale. But there is no evidence that Mr.

Jackson participated in the packaging process. The resident narcotics expert's testimony did not fill the evidentiary void. The expert testified that people who sell drugs might do so from cars and might "sometimes" divvy up the responsibilities of sales and distribution. As the government effectively concedes, however, there was no evidence that Mr. Jackson actually engaged in the activity described by the expert. The government argues only that the expert's testimony "along with the circumstances surrounding appellant's position in the car," permitted the court to find that Mr. Jackson and Mr. Winfield were using the distribution method described by Detective Thomas. If this evidence of "just sitting" were adequate to support an inference of active drug dealing, the government could convert any insufficient proximity case into a legitimate conviction simply by presenting generalized resident narcotic expert testimony.[11] Such a result would contravene the due process principles which the beyond-a-reasonable-doubt standard upholds. *See Rivas,* 783 A.2d at 133 ("[p]roof of a fact beyond a reasonable doubt[,] ... a component of due process, ... 'operates to give "concrete substance" to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding'" (quoting *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979))).

Lastly, the government argues that the evidence supports a conclusion of guilty

---

door shut and thus conceal the revolver." *Hutchinson,* 944 A.2d at 494 n. 4. By contrast, there is no evidence that Mr. Jackson used his position in the backseat to protect or hide the drugs in the cooler. *See id.* (determining that *Smith* had "no parallel in the bare fact that [Hutchinson's] feet were positioned next to the drugs"). *Parker* is a pre-*Rivas* case where the court relied on the inference, deemed insufficient by *Rivas,* that both defendants were in the "confined space" of a car with the

drugs equidistant between them. *Parker,* 601 A.2d at 52.

11. *But see Rivas,* 783 A.2d at 153 (Ruiz, J., concurring) (rejecting the proposition that expert testimony which "find[s] no echo" in defendant's actions can, in combination with defendant's proximity to drugs, render evidence of constructive possession sufficient).

intent beyond a reasonable doubt because *Mr. Winfield* decided "to leave [Mr. Jackson] alone with $360–$370 worth of marijuana in a car with the keys in the ignition," which in turn "supports an inference that appellant was not simply an 'incidental bystander' but rather was engaged in a common enterprise to sell drugs with [Mr.] Winfield...." Again we question the characterization that Mr. Jackson was "left alone" in the car, when the record reflects that Mr. Winfield was standing just across a neighborhood street from his vehicle and contains no information about when Mr. Jackson entered the car. And here again *Rivas* forecloses the government's argument. "If knowing proximity to drugs is insufficient to prove guilt, being permitted to be in proximity adds virtually nothing unless the evidence also divulges *why* permission was granted." 783 A.2d at 136. Mr. Winfield's "unexplained willingness to let [Mr. Jackson] near his drugs in the circumstances of this case does not illuminate the intent of [Mr. Jackson]." [12] *See id.*

In sum, the evidence that Mr. Jackson constructively possessed drugs was insufficient as a matter of law where the testimony at trial established only that he was briefly observed seated in the back seat of Mr. Winfield's car, where a closed cooler containing marijuana was also located. Mr. Jackson's proximity to the cooler and his presumed knowledge of its contents, alone, could not support a determination beyond a reasonable doubt that Mr. Jackson intended to exercise dominion or control over the drugs. Absent "something more in the totality of circumstances—a word or deed, a relationship or other pro-

bative factor," *Rivas*, 783 A.2d at 128—a fact-finder could only speculate about whether Mr. Jackson possessed the requisite guilty intent. Accordingly, we reverse Mr. Jackson's conviction for possession with intent to distribute and remand for entry of a judgment of acquittal.

*So ordered.*

---

12. The government invites us to rely on *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), for the proposition that "automobile passengers 'will often be engaged in a common [criminal] enterprise with the driver.'" But we decline to rely on a decision interpreting what constitutes probable cause to make an arrest to assist us in determining what quantum of evidence is sufficient to establish a defendant's guilt beyond a reasonable doubt.