667 A.2d 573 (1995)
In re M.I.W., Appellant.
No. 94-FS-863.
District of Columbia Court of Appeals.
Argued September 12, 1995.
Decided November 9, 1995.
Judith A. Lovelace, Washington, DC, appointed by this court, for appellant.
Sidney R. Bixler, Assistant Corporation Counsel, with whom Garland Pinkston, Jr., Corporation Counsel at the time the brief was filed, Robert R. Rigsby, Deputy Corporation Counsel, and Rosalyn Calbert Groce, Assistant Corporation Counsel, were on the brief, for appellee.
Before STEADMAN, and REID, Associate Judges, and MACK, Senior Judge.
REID, Associate Judge:
Appellant raises four issues on appeal, whether: (1) the trial court abused its discretion when it failed to dismiss a petition against a juvenile for "social reasons;" (2) certain evidence should have been suppressed under the Fourth Amendment to the United States Constitution; (3) the trial court abused its discretion in denying the motion for judgment of acquittal after the government's opening statement; and (4) the evidence presented at trial was insufficient to support a finding of guilt.[1] We reverse M.I.W.'s conviction on the ground that there was insufficient evidence to show that he had constructive possession of a machine gun found under the front passenger seat of the car in which he was riding.

I. FACTUAL SUMMARY
On February 23, 1994, the District of Columbia filed a juvenile Petition against M.I.W. based upon events which took place on February 22, 1994. M.I.W. was charged with: (1) unlawful possession of a machine gun in violation of D.C.Code § 22-3214(a) (1989), (2) possession and control of a firearm without a valid registration certificate for a firearm in violation of D.C.Code § 6-2311(a) (1989), and (3) possession of ammunition without a valid registration certificate for a *574 firearm in violation of D.C.Code § 6-2361 (1989).
At approximately 10:30 P.M. on the evening of February 22, 1994, M.I.W. was in the back seat of a two-door Hyundai car which was traveling south on 6th Street, N.W. About the same time, two United States Park Police officers, Officers Neider and Richard were driving north on 6th Street, N.W. They noticed that the Hyundai did not have a front tag and had a temporary rear D.C. tag. The officers made a U-turn to stop the vehicle; the Hyundai turned onto "O" Street and pulled to the curb. Officer Neider testified that the occupants, three males, "jumped out of the vehicle." Two had been seated in the front and M.I.W. in the back of the car. Officer Neider "thought [they] ... were going to run." At this point M.I.W. had almost reached the front of the car. Officer Neider ordered the three "back to the vehicle" and they obeyed the command. Officer Richard testified that "the vehicle pulled quickly to the side of the road and all the occupants quickly stepped from the vehicle." He described the event as follows:
I remember it pulled very suddenly as the vehicle made a left from Sixth onto `O' and then just sort of jerked to the curb  pulled quickly to the curb and the car came to a stop very quickly. As a matter of fact, I specifically recall that all three occupants of the vehicle including Mr. W., who was a back seat passenger, were out of the car before I could get my door open and even start to get out myself  it was very quickly how fast they were out of the car.
Officer Richard confirmed that the three males returned to the vehicle upon command.
Officer Neider patted down the three occupants. He found "a fairly large amount of crack cocaine" on the driver, but nothing on M.I.W. The driver of the Hyundai was placed under arrest, and put into a police cruiser. "Larger amounts of crack cocaine ..." as well as "zip lock baggies" were found on the person who had been seated on the front passenger side of the car.
After the driver's arrest, Officer Richard searched the Hyundai. M.I.W. and the other passenger remained outside the vehicle with Officer Neider. Officer Richard searched the car while standing outside and using a flashlight to look in. He "put his head behind" the front passenger seat and saw a "SW-MAC 11 .9 millimeter machine gun." He described his discovery as follows:
I opened the door, I briefly checked the front seat area, as I put my head behind  it was like a bucket seat, head was to the rear of the bucket seat, I was standing outside the car, the very back edge of the gun  the rear storage area, that's the first thing I saw right  as I was in that position. And as I lowered my head and looked down at the seat, I saw the full weapon. The weapon  the handle was laying towards the middle of the car, the barrel was pointing towards the front end of the car ... It was probably ... a little less than an inch of the corner in the rear side area.
As Officer Richard bent over towards the back seat area, "the entire gun became visible, it was ... pretty much barrel straight forward then under the seat."
On cross-examination, Officer Richard responded to questions concerning his discovery:
Q. Now, when you first  when you're using your flashlight in there and you see  you spot some object there and see it's only sticking out about less than an inch, you tell us, is that correct?
A. Correct.
Q. So you can't tell at that point what it is, a gun or anything else, is that correct?
A. That's correct.
Q. Okay, it's only later on  oh, by the way, the front seat  passenger seat, does it move back and forth for egress and exits?
A. I believe  yes, as if to adjust it for leg room in the front? Is that what you mean?
Q. Yes.
A. Yes it does....
Q. Okay, okay now, it isn't until you bent all the way to look down underneath *575 the seat that you notice that it's a gun, is that correct?
A. Yeah, correct, that I notice it's a  in the shape of a gun, that's correct.
At first Officer Richard thought it was a toy. He asked M.I.W. and another one of the three males whether it was real. They said, "they didn't know what it was about." He then secured the two males while his partner looked at the gun. Officer Richard returned to the car and "pulled the gun out." He stated: "Okay, what I did was I slid it out full way under the seat so it could be seen and I really was not sure how to make that weapon safe, or if in fact it was loaded at all."
By this time, a third officer had appeared on the scene. He found that the gun was loaded. The gun was tested later and proved functional. M.I.W. did not have a license to carry the gun, and there was no record of a firearm registered in his name.
At the end of the government's case, M.I.W. moved for judgment of acquittal on the ground of failure to show possession or dominion or control over the gun. The government opposed the motion on the ground that when M.I.W. walked away from the car he manifested "some consciousness of guilt." Further, the government argued, the gun had to be visible to M.I.W. since Officer Richard saw the gun while standing up and looking down, and also saw the whole gun when he bent over.
The trial court denied the motion on the following grounds:
Based on what appeared to be Mr. W.'s attempt to hastily leave a vehicle, while it was obvious that police were coming up to make some type of a stop and a court drawing an inference based on where the gun was, not only could it have been seen by Mr. [W.'s]  feet literally had to be touching. There's enough evidence there, if I believe it in the end to find Mr. W. guilty....
The defense then rested its case without calling any witnesses. The court found M.I.W. guilty on all of the charges set forth in the petition against him. The court explained its decision as follows:
After that car was stopped, [M.I.W.], for unknown reasons seemed to be beating a hasty retreat, he did stop when the police called him. He had gotten out of the back seat and for all practical purposes his feet had to be on top of that gun the way it was positioned. There was nothing covering the gun where it's appearance there would have been obliterated to [M.I.W.] and although there is no evidence whatsoever that [M.I.W.]  that this court can conclude that [M.I.W.] had the gun in his hand, [M.I.W.'s] feet were on top of that gun, he had to know it was there and the attempt to beat a retreat implies to this court that he not only had knowledge, he had an intent to control it when it was there with him. So I find him guilty, I'm satisfied beyond a reasonable doubt the Government has proved all the elements.

II. SUFFICIENCY OF THE EVIDENCE
M.I.W. maintains that the evidence was insufficient to convict him of the charges set forth in the petition.
We review the sufficiency of the evidence "in a light most favorable to the government, giving it the benefit of all reasonable inferences." Patterson v. United States, 479 A.2d 335, 337-38 (D.C.1984) (citing Morrison v. United States, 417 A.2d 409, 412 (D.C.1980), and Hooks v. United States, 373 A.2d 909, 912 (D.C.1977)). "It is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." Gayden v. United States, 584 A.2d 578, 580 (D.C.1990) (quoting Frendak v. United States, 408 A.2d 364, 371 (D.C.1979)).
Since there is nothing in the record to indicate that M.I.W. ever possessed or owned the machine gun, the government had to prove constructive possession. "Constructive possession of a weapon requires proof that a defendant (1) knew of the weapon's location; (2) had the ability to exercise dominion and control over it; and (3) intended to exercise such dominion and control." Hood v. United States, 661 A.2d 1081 (D.C.1995) and Taylor v. United States, 662 A.2d 1368 (D.C.1995). *576 We focus on the first and third elements. Since the gun was in easy reach of M.I.W., he had the ability to exercise dominion and control over it. However, the critical questions are whether he knew of the gun's location and whether he intended to exercise dominion and control over it.

A. M.I.W.'s Knowledge of the Weapon's Location
The trial court concluded that M.I.W.'s "feet were on top of [the] gun" and "[t]here was nothing covering the gun where it's appearance there would have been obliterated to [M.I.W.]." Neither officer testified to seeing M.I.W.'s feet on top of the gun. Nor did either officer testify that he sat in the back seat behind the front passenger seat prior to the removal of the gun to test whether M.I.W.'s feet had to rest on the gun which protruded less than one inch into a rear corner of the vehicle.
In Burnette v. United States, 600 A.2d 1082, 1083 (D.C.1991), a passenger in the rear of the vehicle was charged with possession of an unregistered firearm and other crimes after a .9 millimeter handgun was found under the floormat where he was seated. An officer testified that the handgun "was bulging upwards from beneath the mat." The court concluded that "the jury could properly infer that appellant must have placed his feet on the mat, felt a large hard object, lifted up the mat, and seen the gun. Moreover, he clearly was able to exercise dominion and control since the gun lay directly at his feet and far closer to him than to either of the other two occupants of the jeep." Id.
M.I.W.'s situation is different; less than one inch of the gun protruded into a rear corner of the car. Most of the gun was under the front passenger seat. There was no testimony regarding how large the rear of the car was, or how far the adjustable front passenger seat extended forward while M.I.W. was seated in the back. Moreover, it was dark and Officer Richard had to use a flashlight to search the car. Neither officer recalled whether there was a functional interior light in the car. At first sighting, Officer Richard could not even tell that it was a gun, and even when he bent all the way down to look under the seat, he thought at first it was a toy.
The record contains no direct evidence that M.I.W. knew where the gun was located. When the officer asked M.I.W. and the front seat passenger whether the gun was real, they said: "They didn't know what it was about." The trial judge inferred M.I.W.'s knowledge of the gun based upon his conclusion that: "After the car was stopped, [M.I.W.], for unknown reasons seemed to be beating a hasty retreat...."
While we have recognized that "flight" sometimes indicates consciousness of guilt, we have also held that it may be innocent conduct. "Leaving a scene hastily may be inspired by innocent fear, or by a legitimate desire to avoid contact with the police." Smith v. United States, 558 A.2d 312, 316 (D.C.1989) (en banc). Furthermore, "in those cases in which we have found that flight indicated a consciousness of guilt, the accused clearly knew that the police were present and reacted by immediately running from the scene of the alleged crime." Id. at 316-17. In Cauthen v. United States, 592 A.2d 1021, 1022, 1024 (D.C.1991), in which an accused "began to walk away `at a brisk pace' as officers arrived on the scene," we reiterated what we said in Smith: "For flight to suggest consciousness of guilt  a mentality other than a legitimate desire to avoid the police  that flight must not only be very clearly in response to a show of authority but also must be carried out at such a rate of speed, or in such an erratic or evasive manner that a guilty conscience is the most reasonable explanation."[2] The two officers testified that the three males "jumped out of the vehicle" or "quickly stepped from the vehicle" after it reached the curb. However, on cross-examination one officer stated:
[M.I.W.] was in the back seat and he had to get out from the back. When we first saw [M.I.W], he was closing the door to *577 the car and started to walk forward. By the time we called to them, the driver and passenger were about 15 feet in front of the car, respondent was at about the front of the car, maybe a little further.
In our cases, we have looked for more than "walking away" to find manifestation of a consciousness of guilt. In United States v. Bennett, 514 A.2d 414, 416 (D.C.1986), two men "bolted" when police officers arrived. In Tobias v. United States, 375 A.2d 491, 492 (D.C.1977), defendant "increased his pace from that of a fast walk to that of a run" after someone shouted that the police officers were behind him. Here, M.I.W. did not "bolt" or start to walk faster when the officers issued the command to return to the car. He obeyed the command.

B. Intent to Exercise Dominion and Control Over the Gun
Even if we assume that M.I.W. knew that the gun was located under the front passenger seat and that M.I.W. had the ability to exercise dominion and control over it, there can be no conviction on the basis of constructive possession unless it is clear beyond a reasonable doubt that M.I.W. intended to exercise dominion and control over the gun.
The government maintains that M.I.W.'s case is identical to In re F.T.J., 578 A.2d 1161 (D.C.1990), where we found that the evidence was sufficient to show constructive possession. There, appellant was a passenger in the back seat of a vehicle which had gone through a red light and which had unlawfully high beams. After three persons were told to get out of the car, the police found a semi-automatic rifle "partly concealed beneath the driver's seat behind which appellant had sat." Id. In F.T.J., "[b]etween six and nine inches of the gun, including the stock and the trigger, protruded out from behind the driver's seat." Id. In addition to the rifle, two revolvers were found, one under the driver's seat, and one under the front passenger seat. The court concluded that the evidence was sufficient to convict appellant because (1) the machine gun was clearly visible, (2) appellant would have seen the gun upon entering the vehicle due to an interior dome light, (3) appellant had been in the car for fifteen or twenty minutes and at some point "would have, virtually, kicked the machine gun", (4) since there were three guns in the car, it was reasonable to infer that there was one gun per person, and 5) "appellant, by his own account, had been shot in the stomach a month earlier, ... [and] `had a motive to have some weapons on him.'" Id. (footnote omitted).
M.I.W. is a vastly different case, with a vastly different evidentiary record. The machine gun here protruded less than one inch into the rear corner of the car. There is no evidence that M.I.W. had been in the car for a substantial period of time before it stopped on "O" Street, or that the vehicle had a functional interior light. The officer had a flashlight when he searched the car. There was only one gun found and three occupants. The record reveals no evidence that M.I.W. had been shot or had any reason to possess a weapon out of fear for his life. In addition here, as in Taylor, supra, "the government presented no evidence connecting [M.I.W.] to the car..... [N]o evidence was presented concerning the car registration or any other information showing that [M.I.W.] owned the car. Nor was there any evidence showing that [M.I.W.] regularly used the car (or that he had ever used it prior to the night of his arrest) even if he did not legally own it." 662 A.2d at 1373. Furthermore, large quantities of crack cocaine were found on the driver and the passenger, not on M.I.W.
Even on the facts of Burnette, supra, where the feet of the passenger in the rear of the car had to have come into contact with the weapon, we held that intent to exercise dominion and control could not reasonably be inferred. First, we were unwilling to infer such intent based upon the "plain feel" doctrine, and further concluded that "the inference of a car passenger's intent to exercise control drawn solely from evidence of the passenger's convenient access to contraband... in a car should not be extended beyond situations where the evidence shows the contraband was in plain view of that passenger defendant." 600 A.2d at 1084. Here it is not reasonable for the court to infer beyond a reasonable doubt that M.I.W. had the intent to exercise dominion and control over the *578 gun based on the "plain view" doctrine, since the gun protruded less than one inch into a rear corner of the car.
Second, in Burnette, we concluded that "proof of constructive possession may be furnished `by evidence linking the accused to an ongoing criminal operation of which that possession is a part.'" Id. (citing Davis v. United States, 564 A.2d 31, 44 (D.C.1989)). Burnette's conviction was reversed because there was no evidence of a criminal venture on the defendant's part "centering around possession" of the gun, Id. Here there was no evidence that M.I.W. was engaged in any criminal activity whatsoever. Although large amounts of crack cocaine were found on the driver and the front seat passenger, nothing of an untoward nature was found on M.I.W. Furthermore, as the court observed in Burnette, "the government did not present any evidence as to the relationship between appellant and the other two occupants" of the car. Id.[3]
In sum, the record here does not contain the requisite evidence from which a reasonable mind might fairly infer "guilt beyond a reasonable doubt." Gayden v. United States, supra 584 A.2d at 579.

III. CONCLUSION
M.I.W.'s conviction is reversed on the ground that the evidence is insufficient to sustain his conviction.
NOTES
[1] We focus only on the sufficiency of the evidence issue and hence do not address points (1), (2) and (3).
[2] The government does not argue that the Smith analysis developed in a Fourth Amendment suppression context does not equally apply in a sufficiency of the evidence context and we, therefore, do not address any such possible differentiation here.
[3] The government makes no argument attempting to link the gun and the drugs as part of a single operation in which M.I.W. was involved, nor did the trial court suggest any such inference.