24 A.3d 63 (2011)
In re M.L., Appellant.
No. 08-FS-994.
District of Columbia Court of Appeals.
Argued January 18, 2011.
Decided June 30, 2011.
*64 Fleming Terrell, Public Defender Service, with whom James Klein, Jaclyn Frankfurt, and O. Dean Sanderford, Public Defender Service, were on the brief, for appellant.
Janice Y. Sheppard, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia *65 at the time the brief was filed, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Attorney General, were on the brief, for the District of Columbia.
Before OBERLY, Associate Judge, REID, Associate Judge, Retired,[*] and BELSON, Senior Judge.
OBERLY, Associate Judge:
After a bench trial, the Superior Court adjudicated M.L. a delinquent, holding that he committed the offenses of carrying a dangerous weapon ("CDW"), in violation of D.C.Code § 22-4504(a) (2001), and possession of a prohibited weapon ("PPW (b)"), in violation of D.C.Code § 22-4514(b) (2001). The trial court also held that M.L. had not committed either assault on a police officer ("APO"), in violation of D.C.Code § 22-405(b) (2007 Supp.) or assault with a deadly weapon ("ADW"), in violation of D.C.Code § 22-402 (2001). M.L. argues on appeal that the evidence was insufficient to prove either CDW or PPW (b). We disagree and affirm the adjudication of delinquency.

I. Background
On March 18, 2008, Metropolitan Police Department Officer Christopher Wade drove with his wife, Latreece Wade, to the home of her parents, Thelma and Lavern Johnson, on Hanna Place in the District of Columbia. Officer Wade, who did not think the weather was cold, was off-duty and wore blue jeans and a sweatshirt, and Ms. Wade wore a sweatshirt and a jacket. The Wades arrived at Hanna Place, a one-way street, after dark, around 8:30 p.m. Neither Officer Wade nor his wife saw any pedestrians on the street, although Officer Wade purposely looked for pedestrians while driving down the street because his in-laws had been robbed only days earlier, and looked in his driver's side and rearview mirrors after parking. He parked on the left side of the street in front of Mr. Johnson's car, which was parked in front of Mrs. Johnson's car, which was located directly in front of the Johnsons' house, also on the left side of the street. After exiting the car and walking toward the Johnsons' house, Officer Wade saw something move in the rear of his mother-in-law's car and first thought that it was an alarm light. When he saw the movement again, it looked like something moving at the rear of the car and he thought that it was the wagging tail of a dog.
Mrs. Johnson, who was inside her home when the Wades arrived, heard a car door shut outside and looked out a living room window facing the street. In addition to seeing the Wades exiting their car, she "noticed someone crouching beside the rear" of the passenger side of her car. Mrs. Johnson could see "a head bobbing up and down, as though the person were moving toward[ ] the front passenger side of [her] car." After Mrs. Johnson told her husband of her observation, Mr. Johnson looked out the window and "saw a person at the back rear of [his] wife's car kind of sliding, sliding behind her car ... really very close to her car," with the head "[d]ucking down more or less, more or less trying, the way [Mr. Johnson] saw it, not to be seen, the way it was done." From the porch of her house, Mrs. Johnson yelled out to her daughter that there was somebody hiding behind her car.
After Mrs. Johnson yelled, Officer Wade drew his service weapon and walked between Mr. Johnson's and Mrs. Johnson's cars and out to the street. Once on the street, he saw M.L., who was wearing a *66 black hooded sweatshirt with the hood up, a jacket, and red gloves, squatting down at the rear tire of Mrs. Johnson's car. Pointing at M.L., Officer Wade yelled "police, what are you doing?" M.L. stood up and, while still facing Officer Wade, backed away from him and then started running away, up a grassy area next to the Johnsons' house. Officer Wade ran after M.L., approximately twenty feet behind, yelling to M.L. to stop and to show his hands because, while running, M.L. was "tugging in [his] left [jacket] pocket." Officer Wade saw M.L. pull a silver, shiny object from his pocket and turn about halfway around to look back at Officer Wade. Thinking that the object was a gun, Officer Wade began shooting at M.L. M.L. jumped over the fence of the Johnsons' backyard but took only a few steps before laying down on the ground by the rear fence. Officer Wade approached the fence, yelled to M.L. to show Officer Wade his hands, and asked where the gun was. M.L. responded that it was a knife, which he had thrown on the other side of the fence, and added: "I'm only 17. I'm only 17."
When uniformed officers arrived, Officer Wade took a flashlight from one of them, went over the fence, and approached M.L., pulling off M.L.'s hood. Officer Wade later learned that two of his shots had hit M.L. The knife, found outside the Johnsons' backyard, was a folding knife in an open position, and one of the officers who arrived after the shooting testified that it was larger than a pocket knife. The "business part" of the blade measured two and fifteen-sixteenths inches long.
The trial court credited the testimony of all of the witnesses and made the following findings of fact: M.L. was present at Hanna Place after dark; he was hiding behind Mrs. Johnson's car, which was a "stealthy act"; M.L. was wearing dark clothes, including a hoodie that obscured his face, and wearing gloves on a night that was not cold; M.L. possessed a knife that was "open and ready for use"; M.L. fled from Officer Wade, whom he knew to be a police officer; and M.L. responded to Officer Wade's question about the whereabouts of the gun by responding with a "legal concept": "I'm only seventeen, I'm only seventeen." The trial court found that on the basis of these facts, M.L. intended to use the knife as a weapon for an unlawful purpose.
Convicting M.L. of CDW, the trial court found that M.L.'s purpose in carrying the knife was to use it as a dangerous weapon, the only element of CDW that M.L. argued lacked sufficient evidence. To support its contrary finding, the trial court discussed both the nature of the knife, which, significantly, needed no alteration to inflict death or great bodily injury, and the surrounding circumstances, specifically M.L.'s "hiding behind a car wearing dark clothing, having the knife open and running when confronted by the officer."
The trial court also convicted M.L. of PPW (b), concluding, on the basis of the aforementioned findings of fact, that the government had proven beyond a reasonable doubt that M.L. had the "intent[ ] to use the knife as a weapon for an unlawful purpose," and because, as discussed for the CDW charge, the knife was "dangerous."

II. Discussion
M.L. challenges the sufficiency of the evidence supporting his convictions for CDW and PPW (b). The standard of review for such challenges is firmly established. We view the evidence "in the light most favorable to the prosecution to determine whether a reasonable factfinder could find guilt beyond a reasonable doubt." Lewis v. United States, 767 A.2d 219, 222 (D.C.2001) (citing Kelly v. United States, *67 639 A.2d 86, 89-90 (D.C.1994)). "Deference must be given to the factfinder's duty to determine credibility, weigh the evidence, and draw justifiable inferences of fact." Lewis, 767 A.2d at 222 (citing Abdulshakur v. District of Columbia, 589 A.2d 1258, 1263 (D.C.1991)). In a bench trial, "the trial court's factual findings will not be overturned unless they are `plainly wrong' or `without evidence to support [them].'" Lewis, 767 A.2d at 222 (alteration in original) (quoting Mihas v. United States, 618 A.2d 197, 200 (D.C.1992)).
"Proof beyond a reasonable doubt is not merely a guideline for the trier of fact; it also furnishes a standard for judicial review of the sufficiency of the evidence." Rivas v. United States, 783 A.2d 125, 134 (D.C.2001) (en banc) (citing Jackson v. Virginia, 443 U.S. 307, 316-17, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Although appellate review of sufficiency challenges is deferential, it is not "toothless," as we must ensure that a rational finder of fact could find the evidence "persuasive beyond a reasonable doubt." Rivas, 783 A.2d at 134. Evidence that is relevant is not automatically sufficient. See id. (quoting Jon O. Newman, Beyond "Reasonable Doubt," 68 N.Y.U.L.REV. 979, 996 (1993)). The evidence is sufficient if, "`after viewing [it] in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Rivas, 783 A.2d at 134 (quoting Jackson, 443 U.S. at 319, 99 S.Ct. 2781). In contrast, the "`evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation.'" Rivas, 783 A.2d at 134 (quoting Curry v. United States, 520 A.2d 255, 263 (D.C.1987)). In sum, the "`jury is entitled to draw a vast range of reasonable inferences from [the] evidence,'" but it "`may not base a verdict on mere speculation.'" Rivas, 783 A.2d at 134 (quoting United States v. Long, 905 F.2d 1572, 1576 (D.C.Cir.1990)).
M.L. challenges the sufficiency of the evidence only to prove the "purpose" and "intent" elements of CDW and PPW (b), respectively. We hold that on the basis of the evidence presented in this case, it was reasonable for the trial court to infer both that M.L. carried the knife for the purpose of using it as a dangerous weapon, a required element of CDW, see Reed v. United States, 828 A.2d 159, 162 (D.C.2003), and that M.L. had the intent to use the knife unlawfully against another, a required element of PPW (b). See Reid v. United States, 581 A.2d 359, 362 (D.C. 1990).[1]

A. CDW
The CDW statute states that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person ... any deadly or dangerous weapon capable of being so concealed." D.C.Code § 22-4504(a). In order to prove CDW "when the weapon in *68 question is a knife, the government must prove beyond a reasonable doubt (1) that the defendant carried the knife either openly or concealed, (2) that the defendant had the general intent to do the acts constituting the carrying of the knife, and (3) that the purpose of carrying the knife was its use as a dangerous weapon." Reed, 828 A.2d at 162.
"A deadly or dangerous weapon is one which is likely to produce death or great bodily injury by the use made of it." Scott v. United States, 243 A.2d 54, 56 (D.C.1968). All knives are not dangerous weapons per se, see Lewis, 767 A.2d at 222, and a knife may be legally carried as a tool or for another utilitarian purpose. See Reed, 828 A.2d at 162; Scott, 243 A.2d at 56. The carrying of an otherwise useful object is outlawed by the CDW statute "where the surrounding circumstances, such as the time and place the defendant was found in possession of such an instrument, or the alteration of the object, indicate that the possessor would use the instrument for a dangerous purpose." Scott, 243 A.2d at 56. Another relevant surrounding circumstance is "the conduct of the defendant immediately prior to arrest." Lewis, 767 A.2d at 223. The nature of the knife, namely its design or construction, is also important. See id. at 222-23 (citing Monroe v. United States, 598 A.2d 439, 441 (D.C.1991)). In sum, to determine whether the government has met its burden of proving that the knife was carried for use as a dangerous weapon, this court "must ordinarily consider both the nature of the knife itself[ ] and the circumstances under which it was carried." Lewis, 767 A.2d at 223.
We agree with M.L. that the type of knife he carried could be carried for a utilitarian or otherwise legitimate purpose. The question in this case is whether the nature of the knife and the circumstances in which M.L. was found with it reasonably support an inference that he carried the knife for use as a dangerous weapon on the evening of March 18. We hold that the evidence was sufficient for the trial court to conclude, beyond a reasonable doubt, that M.L. carried the knife for the purpose of using it as a dangerous weapon.
We first consider the nature of the knife itself, including its design and construction. The sharp portion of the blade was just shy of three inches long. It is beyond cavil that the blade itself was long enough that, when open, the knife could be used to inflict great, if not deadly, injury. See Mihas, 618 A.2d at 201 n. 1 ("[E]ven a short knife, when wielded by one to use it unlawfully, can be dangerous."). The handle had a clip. The knife was a folding knife, and, as M.L. notes, because it folded, it could be "kept on hand but safely carried during the performance of various lawful activities in which a knife is occasionally useful."
M.L., however, was not carrying the knife in a folded position, an important circumstance in this case. The trial court found that the knife was "open and ready to use" while in M.L.'s pocket, and M.L. agreed at oral argument that the record supports this finding. In Gilmore v. United States, Gilmore testified that he used his knife for his job as a cement bag handler. 271 A.2d 783, 783-84 (D.C.1970). We noted that Gilmore's closed folding knife had been altered to open for use more quickly than a typical folding knife and found the evidence sufficient to support a CDW conviction. Id. at 783. Although M.L.'s knife was not altered, carrying an open folding knife is even more indicative of an intent to use it as a dangerous weapon than the alteration in Gilmore. Keeping the knife in an open position in his pocket, notwithstanding the danger of exposing his own body to the *69 blade, strongly suggests that M.L.'s purpose for carrying the knife was to use it in a situation in which quick access to the blade was important, and it is difficult to imagine that quick access to the blade could be important for any use other than against another person, who is able to approach suddenly, fight back, and move around. Thus, the nature of M.L.'s knife (a folding knife with a nearly three-inch blade), combined with the fact that he carried it in his pocket in an open position, supports a reasonable inference that he carried the knife not for utilitarian purposes but to use it as a dangerous weapon.
Turning to the other surrounding circumstances, we agree with the trial court that M.L.'s hiding in a crouched position behind Mrs. Johnson's car, in the dark, and wearing gloves on a night that Officer Wade credibly testified was not cold, also supports the finding that M.L. carried the knife for the purpose of using it as a dangerous weapon. In addition, the trial court permissibly used M.L.'s flight from Officer Wade as a factor in support of this finding. It is true that there are many reasons an innocent individual may flee from the police and therefore flight alone is not sufficient evidence of guilty knowledge. See In re D.P., 996 A.2d 1286, 1289 (D.C.2010). Flight, however, can be probative of guilt in conjunction with other factors. See In re T.T.B., 333 A.2d 671, 673 (D.C.1975). Along with the other circumstances on March 18, an inference that M.L.'s flight evidenced his guilty conscience was reasonable.[2]
M.L. proposes two alternative explanations for his crouching beside Mrs. Johnson's car that he argues are as plausible as an inference that he was hiding because he intended to use the knife as a dangerous weapon: He "briefly paused beside the car for a lawful purpose completely unrelated to the knife," or he was crouching because he intended to commit a property offense. We do not agree that the evidence supports either of these inferences.
Turning to M.L.'s first alternative theory, it is illogical to suppose that he would have crouched behind the car, rather than stood upright, if he had paused for a lawful purpose. In addition, the evidence does not support an inference that M.L. had paused only briefly. After Mrs. Johnson saw M.L. moving alongside her car, Mr. Johnson looked and saw M.L. sliding behind the car. This credited testimony is inconsistent with the idea that M.L. had stopped momentarily. Furthermore, Officer Wade was actively looking for people on the street while he drove down Hanna Place, and he looked in his car's mirrors after he had parked but saw no one. If M.L.'s presence on Hanna Place after dark was innocent, why was M.L. hiding at least as soon as there were others on the street, if not earlier?
As to an inference that M.L.'s purpose in carrying the knife was only to commit property damage, there was no evidence of *70 damage to any of the cars on the street. Especially if we proceed from M.L.'s premise that he was already hiding on the street before the Wades turned on to Hanna Place, what was he waiting for? A street with parked cars but, as far as the evidence showed, no people was surely the ideal setting in which to commit a property offense, yet there was no evidence of any property offense already committed. Furthermore, there would be no reason for M.L. to risk injury by carrying the knife in an open position if it was to be used against objects that would not move away or fight back during the time it took to remove the knife from his pocket and open it. Therefore, an inference that he intended to use the knife for vandalism or theft was not equally or more plausible than an inference that he hid beside Mrs. Johnson's car because he was carrying the open folding knife for use as a dangerous weapon.
Nor does our case law require that M.L. used or threatened to use the knife in order for the trial court to reasonably infer, after reviewing all of the circumstances, that his purpose in carrying the knife was to use it as a dangerous weapon. In numerous cases, we have affirmed a CDW conviction in the face of a challenge to the sufficiency of the evidence without any evidence that the appellant used or threatened to use the knife with which he was found. See Reed, 828 A.2d at 161, 163 (appellant was found "sitting alone in a car late at night, in a neighborhood known for drug activity, with a substantial quantity of drugs in the pocket of his jacket" and a three-inch dagger in his waistband); Lewis, 767 A.2d at 221 (during frisk after appellant admitted to having a weapon, a closed folding knife was found in appellant's back pants pocket); Monroe, 598 A.2d at 441 (appellant was attempting to check a briefcase, in which his knife was located, when he was arrested); Mackey v. United States, 451 A.2d 887, 888, 889 (D.C. 1982) (appellant accepted a machete-type knife from another individual and attempted to conceal it in his clothing and an officer who frisked appellant removed the knife from appellant's waistband); Gilmore, 271 A.2d at 783-84 (when police questioned appellant, who was in a bus station at 3:00 a.m. holding another person's bus ticket, appellant tried to dispose of "pegged" folding knife); Scott, 243 A.2d at 55 (police officer "noticed appellant attempting to slide a yellow handled knife up the sleeve of his coat").
In sum, the evidence was "persuasive beyond a reasonable doubt" that M.L. committed the offense of CDW. Rivas, 783 A.2d at 134. The government did not have to negate every possible inference of innocence, see Wheeler v. United States, 494 A.2d 170, 174 (D.C.1985); In re S.P., 465 A.2d 823, 826 (D.C.1983), and it was reasonable for the trial court to discount the other possible explanations of M.L.'s behavior "as too unsubstantiated and implausible to dispel" the inference that M.L., who fled from Officer Wade after he was discovered hiding behind Mrs. Johnson's car, in the dark, with an open folding knife in his pocket and gloves on his hands, carried the knife to use it as a dangerous weapon. See D.P., 996 A.2d at 1291 (Glickman, J., dissenting). We thus affirm the CDW conviction.

B. PPW(b)
The PPW (b) statute states that "[n]o person shall within the District of Columbia possess, with intent to use unlawfully against another, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than 3 inches, or other dangerous weapon." D.C.Code § 22-4514(b). To prove PPW (b), the government had to establish (1) "that the accused possessed a proscribed article," and *71 (2) "that he possessed it with the intent to use it unlawfully against another." Reid, 581 A.2d at 362 (quotation marks omitted).
Because the blade of M.L.'s knife measured just short of three inches, it was not dangerous per se under the PPW (b) statute and the government had to prove, as for CDW, that M.L.'s knife "is one which is likely to produce death or great bodily injury by the use made of it." Dorsey v. United States, 902 A.2d 107, 111 (D.C.2006) (quotation marks omitted). As established in our discussion of the CDW conviction, we agree with the trial court that M.L.'s knife was capable of producing death or great bodily injury.
In addition to proving that the knife is a dangerous weapon, for a PPW (b) conviction the government must prove that the defendant "`possessed [the dangerous weapon] with the intent to use it unlawfully against another.'" Reid, 581 A.2d at 362 (quoting United States v. Brooks, 330 A.2d 245, 246-47 (D.C.1974) (footnote omitted)). A PPW (b) charge "does not require evidence of an attempt to do harm." Jones v. United States, 401 A.2d 473, 475-76 (D.C.1979).
The same evidence that proved that M.L. carried the weapon for the purpose of using it as a dangerous weapon supports the trial court's permissible inference that he possessed the knife with the intent to use it unlawfully against another. As discussed above, the facts that M.L. was crouching behind a parked car at night, wearing gloves, with an open folding knife in his pocket, and fled from Officer Wade, support no other inference. We therefore reject M.L.'s argument that the evidence was insufficient to support a conviction for PPW (b).

III. Conclusion
Accordingly, the adjudication of delinquency is
Affirmed.
NOTES
[*] Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.
[1] We note that our cases are less than crystal clear in articulating the distinction between CDW and PPW (b), other than to state, without significant elaboration, that CDW is a general intent crime, while PPW (b) is a specific intent crime. See, e.g., Mack v. United States, 6 A.3d 1224, 1231 (D.C.2010), and cases discussed therein. We do not undertake in this case to explore the different functions served by the two statutes because the evidence is sufficient to prove both that M.L.'s purpose in carrying the knife was to use it as a dangerous weapon (CDW), and that his specific intent was to use the knife for an unlawful purpose against another (PPW (b)). In another case, the distinction, if any, between the purpose requirement of CDW and the intent-to-use-for-an-unlawful-purpose requirement of PPW (b) may need to be clarified.
[2] We do not agree with the trial court, however, that M.L.'s response to Officer Wade's inquiry about a gun with the statement, "I'm only seventeen," as he lay on the ground after being shot, provides any support for the inference that he carried the knife to use it as a dangerous weapon.

In addition, although it does not influence our determination that the evidence is sufficient to support the trial court's conclusions of law, we note that the trial court's finding of fact that M.L.'s hoodie obscured his face is not clearly supported by the evidence. Officer Wade and Ms. Wade each testified only that M.L. was wearing a hood. Officer Wade testified that he first observed M.L. up close after the other officers had arrived at the scene, and testified that he then had an opportunity to observe M.L.'s facial features, but he never testified that the only opportunity he had to observe M.L.'s facial features was when he pulled off M.L.'s hood.