Deandrai JAMES, Appellant,

v.

UNITED STATES, Appellee.

No. 10–CF–1498.

District of Columbia Court of Appeals.

Argued Feb. 7, 2012.
Decided March 22, 2012.

---

Tonya L. Fleming, appointed by the court, for appellant.

Brandon S. Long, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III and Kathryn Rakoczy, Assistant United States Attorneys, were on the brief, for appellee.

Before OBERLY and BECKWITH, Associate Judges, and REID, Senior Judge.

REID, Senior Judge:

A jury convicted appellant, Deandrai[1] James, of unlawful possession with intent to distribute cocaine, in violation of D.C.Code § 48–904.01(a)(1) (2001).[2] He claims that the evidence submitted to the jury by the prosecution was insufficient to convict him of the charged conduct beyond a reasonable doubt. We conclude that, even when the evidence is viewed in the light most favorable to the government, the prosecution did not sustain the burden of proof required by our decision in *Rivas v. United States*, 783 A.2d 125 (D.C.2001) (en banc). Hence, we reverse Mr. James's conviction and remand this case to the trial court with instructions to enter his acquittal on the charge of unlawful possession with intent to distribute cocaine.[3]

## FACTUAL SUMMARY

The government presented its case against Mr. James through four witnesses, as well as through documentary evidence. Detective Bernard Wood of the Metropolitan Police Department ("MPD") testified that around 3:00 p.m. on November 25, 2008, he was dispatched to the 1700 block of T Street, in the Southeast quadrant of the District of Columbia, to investigate a shooting. The victim, who had been inside a vehicle when he was shot, had exited the car and sought assistance from a neighborhood resident. During his investigation of that shooting,[4] Detective Wood discovered that a black and orange Ford Mustang,

---

1. Mr. James's first name also appears in the record as "Deandre." At one point during the proceedings against him, Mr. James spelled his first name as "Deandrei." Because most of the record and the parties' briefs identify his first name as "Deandrai," we use that spelling in this opinion.

2. The trial court sentenced Mr. James to thirty months of incarceration, followed by five years of supervised release.

3. Given our disposition, we do not address Mr. James's other arguments on appeal.

4. The government did not present any evidence showing that Mr. James was involved in the shooting that resulted in the police being dispatched to the 17th and T neighborhood.

with a Virginia license plate, had been "riddled with bullet holes." The Mustang was located "in the rear" of a residence in the same block of T Street. The police recovered the Mustang as evidence and moved it to MPD's mobile crime laboratory, a locked garage, where it was secured.

A records check revealed that the Ford Mustang belonged to Mr. James. Detective Wood ascertained that MPD officers who were assigned to the T Street area believed "they possibly see [Mr. James] in the neighborhood from time to time." Detective Wood asked these officers to inform Mr. James that he wished to speak with him about "his vehicle being shot." In response to the message received from MPD officers, Mr. James voluntarily went to the Sixth District police station on the evening of November 25, 2008.

Detective Wood testified that as he was walking with Mr. James to the interview room at the Sixth District, he informed Mr. James that he wanted to discuss the "orange Mustang being shot up." Mr. James made a statement, "F that vehicle, you all can have it." Detective Wood revealed that at the time of the interview, the Ford Mustang had not been searched.

Through Detective Wood, the government introduced a videotape of MPD's interview of Mr. James; the tape was shown to the jury.[5] The tape depicted Mr. James entering the interview room with another detective, Detective Blatson, around 7:00 p.m. Later, Detective Wood arrived, informed Mr. James that he was not under arrest, and read Mr. James his rights. Mr. James filled out the rights card. He indicated that he did not want to talk about the Mustang. Detective Wood asked several questions about the vehicle and established that it was registered to Mr. James, and that he had left the registration and other information in the car. After Mr. James revealed his address, phone numbers, and social security number, Detective Wood left the room and Detective Blatson and Mr. James conversed until Detective Blatson was called out of the interview room. Detective Blatson returned and asked Mr. James several questions, including how he had spent the day, whether he worked, whether the Ford Mustang was his first car, and whether he had been threatened or arrested.[6] Mr. James responded, in part, that he had been picked up by his cousin who took his (the cousin's) mother to the doctor; it was the first time anything of the sort (the shooting up of his car) had ever happened; no one had threatened him; and he had been arrested once before. Detective Blatson again left the room. Detective Wood returned, took Mr. James out of the room and later brought him back and left. At approximately 7:25 p.m., Detective Wood returned and announced that they were finished, and Mr. James was free to leave the police station. Mr. James inquired: "What's the procedure for me getting my car back?" Detective Woods' response is not recorded.

On cross-examination, defense counsel sought to establish that Mr. James had stated that he did not want to talk about the car, but that, nonetheless, the detectives had posed questions to him about his

5. The tape lasted about twenty-five minutes. There was a substantial amount of time during which there was no conversation. The government "fast-forwarded the tape during these 'down times.'"

6. In January 2007, Mr. James was sentenced in Maryland on a theft charge (less than $500) and given the following sentence: "probation without judg[ ]ment/incarceration confinement: 545 days/suspend: 543 days/Probation: 3 years unsupervised."

car.[7] Defense counsel also confronted Detective Wood with his March 4, 2009 affidavit in support of an arrest warrant, which revealed that Mr. James had made the "F the car" statement in the videotape interview room rather than prior to his entrance into the interview room.[8] Detective Wood maintained that the statement was made in the hallway. On redirect examination, Detective Wood declared that he had filled out the arrest warrant affidavit "four and one half months" after Mr. James's interview and again insisted that Mr. James made his statement in the hallway and not in the interview room.[9]

Three vehicles that had been recovered from the 1700 block of T Street as evidence arrived at the mobile crime laboratory around November 25 or 26, 2008, including the Mustang. Mary Wise, an MPD evidence technician, did not process Mr. James's vehicle until November 28, 2010; the delay in processing was due to her inability to open the unlocked doors of Mr. James's car. She described the doors as "suicide doors" and she said they opened "up" rather than "out."[10] Her instructions were to recover "any type of firearms evidence."

Upon inspecting the Ford Mustang, Ms. Wise observed "an armrest that opens up and ... a compartment ... under there" which had "a clear Ziploc bag containing 39 very small orange bags containing crack cocaine." Ms. Wise identified a government exhibit, a picture of the center console and the armrest. She testified that "the armrest would be the part that closes down on top of it"; that she had opened the armrest and had "t[aken] a picture of the inside." Ms. Wise identified the clear Ziploc bag she had removed from the armrest and the smaller Ziplocs inside the larger Ziploc. In addition to the Ziplocs, Ms. Wise "found a hundred dollars in U.S. currency over top of ... the driver's visor." She retrieved "[a] wallet and a vehicle registration in the glove box in the name of Deandrai James."

Two experts testified for the government, Dr. Steven Shin, a forensic chemist at the Drug Enforcement Administration and an expert in "analysis of controlled substances," and Rene Dessin, an MPD detective who was qualified as an expert in the packaging of narcotics. Dr. Shin stated that the Ziploc bags contained 2.5 grams of cocaine base. Detective Dessin opined that 39 bags would yield $390, and that one would not purchase 39 bags for personal use.

Mr. James testified in his own defense. He was off from work on November 25, 2008, and he went to his mother's house in the 1700 block of T Street, S.E. He arrived there around 10:00 a.m. and parked his car in the rear of the house because he had Virginia license tags. He stayed at his

---

7. Defense counsel did not file a pretrial motion to suppress Mr. James's statements made during the videotaped interview.

8. Detective Wood's affidavit said, in part:
   During the interview Mr. James was questioned about his vehicle being shot up, Mr. James stated that he did not know anything about his vehicle being shot up. Mr. James further stated to Detective Wood "F[* *]K THAT CAR YALL CAN HAVE IT. I DON'T WANT IT". Detective Wood then asked Mr. James why did he fill [sic] like that about his vehicle. Mr. James then stated: "I DON'T WANT TO TALK TO YALL ANYMORE. I WANT TO LEAVE[.]" Mr. James was not under arrest and was free to leave. Mr. James did so.
   (Alteration in original).

9. When defense counsel moved to introduce the affidavit into evidence, the trial court ruled that a redacted affidavit showing only Mr. James's statement about the car would be admitted.

10. Ms. Wise may have meant "wing doors."

mother's home for about two and one half hours until his cousin picked him up. His cousin took his mother to the doctor's office and Mr. James then proceeded to his girlfriend's house. While he was there, he received a telephone call from his mother; she notified him that the police wanted to speak with him. Mr. James acknowledged that the wallet (which had no money) and car registration found in the car belonged to him, but he denied ever seeing the drugs found in his car, and he claimed that the money in the driver's visor was not his. He denied giving anyone permission to use his car on November 25, 2008. He admitted that he had been convicted of theft in July 2007, in Maryland. In addition, he denied making the statement that the police could keep his car.

The trial court denied Mr. James's motions for judgment of acquittal. Prior to closing arguments, the trial court gave final instructions to the jury. With respect to constructive possession, the trial court told the jury:

[A] person may exercise control over property not in his physical possession if that person has both the power and the intent at a given time to control the property and that's considered constructive possession.

Mere presence near something or mere knowledge of its location is not enough to show possession. To prove possession of cocaine against the defendant in this case, the government must prove beyond a reasonable doubt that he either had actual or constructive possession of it.

Following closing arguments, the jury retired to deliberate on June 23, 2010. During deliberations, the jury sent a note to the trial judge asking for clarification regarding the definitions of constructive possession and reasonable doubt. After discussion with defense and government

counsel, the trial court decided not to say anything more on reasonable doubt and referred the jurors to the standard reasonable doubt instruction that it had given during final instructions. However, the trial judge instructed the jury further with respect to constructive possession, stating in part:

To prove constructive possession, the prosecution is required to show that the defendant knew that the cocaine was present and that he had ability and the intent to exercise dominion and control over it. There must be something more taken [sic] in the totality of the circumstances—a word, a deed, a relationship or some other probative factor—that proves beyond a reasonable doubt that Mr. James intended to exercise dominion and control over the drugs and that he was not a mere bystander. And you may consider any factor that bears upon that.

After giving this instruction, the trial judge sent the jury home.

The jury resumed its deliberations the next morning and, after a few hours, it sent another note to the trial judge asking:

How do we establish or prove a relationship exists? Can we consider all information on any piece of evidence, even if not discussed specifically in trial, on Defense Exhibit Number 1? Can we take into account that he is a known drug user and armed and dangerous? Can we have the evidence back?

During her discussion of the note with counsel, the trial judge discovered that an unredacted copy of Detective Wood's affidavit had been sent to the jury, rather than a redacted copy showing only Mr. James's "F that car" statement. The judge and both counsel agreed that there was absolutely no evidence introduced at trial that Mr. James was a known drug user and that he was armed and danger-

ous. After the discussion between the judge and counsel, the trial court informed the jury that the evidence would be sent back to the jury. In addition, the court delivered the following instruction on the relationship question:

> In establishing or proving that a relationship exists, you may look at all the evidence presented during the course of the trial and when you consider that evidence, you may, you are permitted to draw from the facts that you find have been proven such reasonable inferences as you feel are justified in the light of your experience, and I'll send that back to you so you have it in writing.

With respect to the question concerning Detective Wood's affidavit, the court stated, in part:

> [T]here's no evidence that Mr. James is armed and dangerous or known to have used drugs. So you cannot consider that, because that was a typographical error on a basically preprinted form. So you should actually specifically disregard that and ... there's no evidence at all that Mr. James is armed and dangerous or known to have used drugs.

The jury returned to the deliberation room.

Later, the jury sent another note to the trial court. The note asked: "[I]f the drugs were not the defendant's can we conclude that they were in his possession?" After some discussion, counsel and the judge agreed on the following response:

> Yes, ownership and possession are not the same thing, but in order to find that the defendant possessed the drugs, even if he did not own them, you must conclude, however, that he constructively possessed them as that term is defined in [the constructive possession instruction], and I'll send this back to you as well.

A few hours later, the jury sent a note indicating that it had reached unanimous agreement. The jury convicted Mr. James of unlawful possession with intent to distribute a controlled substance. Mr. James filed a timely appeal.

## ANALYSIS

Mr. James contends that the evidence was insufficient to convict him of unlawful possession of cocaine with intent to distribute. He claims that the government did not sustain its burden to prove constructive possession beyond a reasonable doubt; that "the record is devoid of evidence that proves that [Mr.] James was aware that cocaine was in his car"; that "he did not have the ability to exercise dominion and control over the cocaine because he was not in the vicinity or in close proximity to the concealed drugs"; and that "[o]ther than being the registered owner of the Mustang, there was no substantial evidence against [him] tending to prove that he intended to exercise dominion or control of the drugs." He emphasizes that "the 'something more' to prove intent to exercise dominion and control over was lacking" and that "the jury could only speculate about whether [he] had the intent to exercise dominion or control over the cocaine in his car."

The government responds that viewed "in the light most favorable to the government, there was ample evidence that [Mr. James] constructively possessed the drugs found in his car." Specifically, the government argues that Mr. James (1) owned the car where the drugs were found; (2) drove the car to his mother's T Street home on the day of the shooting; (3) did not give anyone permission to drive his car on November 25, 2008; (4) often left valuables in his car; (5) spent around $249 to improve the engine of his car; and (6) made the "F that vehicle" statement. Hence, the gov-

ernment contends, "the jury had more than enough evidence to reasonably infer that [Mr. James] possessed, with intent to distribute, the 39 bags of cocaine found in his car."

■■■ Our analysis is based on the following standards and legal principles. When there is a sufficiency challenge, "[w]e view the evidence in the light most favorable to the prosecution to determine whether a reasonable factfinder could find guilt beyond a reasonable doubt." *In re M.L.*, 24 A.3d 63, 66 (D.C.2011) (internal quotation marks and citations omitted). "The evidence is sufficient if, after viewing [it] in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 67 (citing *Rivas, supra,* 783 A.2d at 134) (alteration in original) (internal quotation marks omitted) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "In contrast, the evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Id.* (citing *Rivas,* 783 A.2d at 134) (quoting *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987)) (internal quotation marks omitted). Thus, "the jury is entitled to draw a vast range of reasonable inferences from [the] evidence, but it may not base a verdict on mere speculation." *Id.* (alteration in original) (internal quotation marks omitted) (citing *Rivas,* 783 A.2d at 134).

■■■ To prove possession with intent to distribute a controlled substance, "the government must establish that the defendant possessed a controlled substance, did so knowingly and intentionally, and possessed the controlled substance with the specific intent to distribute it." *Lawrence v. United States,* 603 A.2d 854, 858 n. 5

(D.C.1992). "When the defendant is not shown to have been in actual possession of the substance, the government must prove that he had constructive possession of the drugs." *Olafisoye v. United States,* 857 A.2d 1078, 1087 (D.C.2004) (citation omitted). To prove constructive possession in this case, "the prosecution was required to show that [Mr. James] knew the cocaine was present in [his] car and that he had both the ability and the intent to exercise dominion or control over it." *Rivas,* 783 A.2d at 129 (citing *In re M.I.W.,* 667 A.2d 573, 575 (D.C.1995)). A showing of mere proximity to drugs is insufficient. *Rivas,* 783 A.2d at 129 n. 3 (citing *Bernard v. United States,* 575 A.2d 1191, 1195 (D.C. 1990)).

■■■ "As in all other constructive possession cases, there must be something more in the totality of the circumstances— a word or deed, a relationship or other probative factor—that, considered in conjunction with the evidence of proximity and knowledge, proves beyond a reasonable doubt that the [defendant] *intended* to exercise dominion or control over the drugs, and was not a mere bystander." *Rivas,* 783 A.2d at 128 (alteration in original). That is, "[t]here must be some action, some word, or some conduct that links the [defendant] to the narcotics and indicates that he had some stake in them, some power over them." *Id.* (quoting *United States v. Pardo,* 204 U.S.App.D.C. 263, 277, 636 F.2d 535, 549 (1980)). "Whether constructive possession has been proven beyond a reasonable doubt in any given case depends ... on a fact-specific inquiry into all the circumstances." *Id.* at 131; *see also Hutchinson v. United States,* 944 A.2d 491, 492–93 (D.C.2008).

■■■ "The reasonable doubt standard of proof requires the factfinder 'to reach a subjective state of near certitude

of the guilt of the accused.'" *Rivas,* 783 A.2d at 133 (quoting *Jackson, supra,* 443 U.S. at 315, 99 S.Ct. 2781). Moreover, "the evidence in a criminal prosecution must be strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt." *Hutchinson,* 944 A.2d at 493 n. 2 (quoting *Rivas,* 783 A.2d at 134).

Here, the government's case was based on circumstantial evidence, and inferences drawn from that evidence. That is, the government offered no direct evidence, such as testimony that someone saw Mr. James in possession of drugs on November 25, 2008, or observed him during a drug transaction on a date close in time to November 25, 2008, or that a fingerprint expert lifted Mr. James's fingerprint from one of the Ziploc bags found in his car; or that someone saw him in his car just before it was riddled with bullets. Rather, the government's proof of the elements of constructive possession (knowledge, ability to exercise dominion or control over the drugs, and intent to exercise dominion or control) depended on Mr. James's ownership of the unlocked car where the drugs were found, the fact that he drove the car on the morning of the same day of the afternoon shooting, often left valuables in his car, gave no one else permission to drive his car, spent about $249 to improve the engine of his car, and on Mr. James's "F that vehicle" statement.

■■■ To be sure, "[t]he elements of constructive possession may be established by direct or circumstantial evidence." *Cox v. United States,* 999 A.2d 63, 69 (D.C. 2010). But where a case is built solely on circumstantial evidence and the inferences drawn from that evidence, we are mindful of the high, demanding standard of proof in a criminal case—a factfinder's "subjective state of near certitude of the guilt of the accused"—*Rivas, supra,* 783 A.2d at 133, and the fact that the evidence "must be strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt." *Hutchinson,* 944 A.2d at 493 n. 2 (internal quotation marks omitted). We are also aware that an inference "may be plausible, but cannot bear the weight of proof beyond a reasonable doubt." *Commonwealth v. Rodriguez,* 456 Mass. 578, 925 N.E.2d 21, 26 (2010).

■■■ In *Rivas,* we noted that the jury could reasonably infer that the owner and driver of the automobile, who was also found with $236 in cash on his person, possessed the drugs that were found in plain view in the front seat console in that he knew they were there and had control over the vehicle's contents. *Rivas, supra,* 783 A.2d at 135. In this case, however, the drugs were not in plain view, and Mr. James was not driving or even present in the car. *See Smith v. United States,* 899 A.2d 119, 122 (D.C.2006) (discussing the "plain view" doctrine and "intent"). Rather, according to the testimony of the evidence technician who searched the Mustang (Ms. Wise), the cocaine was in a compartment under the armrest of the center console, and she had to lift the armrest to see the Ziploc bags containing the cocaine. Moreover, Mr. James was away from his unlocked car and the neighborhood from approximately 12:30 p.m. until sometime after the shooting of his car when he learned that the police wished to speak with him about his car.[11] Hence, under the specific circumstances of the case before us, we do not believe that the

11. Mr. James apparently was at his girlfriend's house when the shooting of his car took place, but the record is silent as to how far she lived from Mr. James's mother's home.

record reflects evidence on which jurors could reasonably infer that the government established Mr. James's proximity to his car close in time to the discovery of the cocaine. Furthermore, there is no evidence in the record showing Mr. James's proximity to the car at a time when drugs were known to be in his Mustang. Ownership does not translate into proximity, and in the circumstances of this particular case, because of "the weight of proof beyond a reasonable doubt," *Rodriguez, supra,* 925 N.E.2d at 26, it is not reasonable to infer that Mr. James knew the drugs were in his Mustang because he was the owner of the car.

▉ Furthermore, the record does not manifest "something more in the totality of the circumstances" in this case that "establishes that [Mr. James] meant to exercise dominion or control over the narcotics." *Rivas,* 783 A.2d at 130. *Rivas* and *Pardo, supra,* identify the "something more" as "a word or deed, a relationship· or other probative factor," *Rivas,* 783 A.2d at 128, and "some action, some word, or some conduct that links the individual to the narcotics and indicates that he had some stake in them," *id.* at 130; *Pardo,* 204 U.S.App. D.C. at 277, 636 F.2d at 549. Here, the government emphasizes Mr. James's words (as recited by Detective Wood): "F that vehicle. Yall can have it." The government contends that these words show Mr. James's knowledge of the drugs located in his car, and that since it was his car, he had the ability to exercise dominion or control over it. Mr. James's words, the government argues, manifested his effort to distance himself from his car, and hence, his consciousness of guilt traceable to the drugs in his car. The government maintains that Mr. James would not have uttered these words "renounc[ing] his car" after spending $249 to improve the engine unless he was aware of the cocaine in the car. But, Mr. James made no effort to avoid contact with the police since he voluntarily appeared at the police station on the same day his car was shot, after receiving the message that the police wanted to speak with him about his vehicle. Nor did he manifest any nervousness (in his words or actions) while he was at the police station and responding to questions posed by Detectives Wood and Blatson. In addition, the cocaine was not in plain view; it was inside the armrest of the center console and there is no evidence as to when the Ziploc bags were placed in the armrest. Thus, the government cannot benefit from the legal principle that "where the contraband is in plain view, . . . the additional evidence necessary to prove the intent element of constructive possession [is] comparatively minimal." *Smith, supra,* 899 A.2d at 122 (internal quotation marks omitted).

Moreover, the government offered no proof showing a relationship between Mr. James and the drugs found in his car, or any drugs at all, or any drug transactions. Although the government presented expert evidence, through Detective Dessin, that 39 bags of cocaine did not manifest personal use, the government offered no evidence that Mr. James had ever attempted to sell drugs to anyone, or that any drug paraphernalia was located either in his car or where Mr. James resided or spent a substantial amount of time, *see United States v. Foster,* 384 U.S.App.D.C. 423, 431, 557 F.3d 650, 658 (2009) ("the fact that drugs and drug paraphernalia were in plain sight supports an inference that [appellant] constructively possessed the drugs"); and there is no evidence in the record establishing the presence of weapons in Mr. James's car or residence that are associated with protection in the drug industry, or any other evidence that would link Mr. James to drugs. *See Cox, supra,* 999 A.2d at 69; *see also Smith, supra,* 899

A.2d at 122 ("The types of conduct that could link a defendant to the contraband may include (but are not limited to): 'evidence linking the accused to an ongoing criminal operation of which the possession is a part, attempts to hide or destroy evidence, other acts evincing consciousness of guilt such as flight, and evidence of prior possession of contraband.' ").

The government relies mainly on *Davis v. United States*, 623 A.2d 601 (D.C.1993). That case predates our decision in *Rivas*. *Rivas* clarifies that "something more" than proximity and knowledge are needed to establish constructive possession. *Davis* is quite different from the instant case.[12] In *Davis*, there was ample evidence showing appellant's consciousness of guilt, as well as evidence establishing the relationship between appellant and the drugs. When the police arrived at appellant's mother's house to execute a search warrant, appellant, who was physically in the home, gave the police a false name and claimed that the bedroom where the drugs were found was that of her sister. *Id.* at 602. These falsehoods, disassociating herself from the person in whom police officers were interested as well as from her mother's residence where drugs were located, reflected appellant's consciousness of guilt. *See id.* at 603–04. Moreover, appellant's name was on a nameplate affixed to the bedroom door, which had a padlock; appellant had the key to the padlock. *Id.* at 603. The drugs (115 plastic packets of heroin, and 36 Ziploc bags of powder cocaine) were recovered from a jacket hanging inside a cabinet in the bedroom; appellant's name

was on the cabinet; and the jacket was appellant's size but much too large to belong to appellant's co-defendant. *Id.* at 602–03. Hence, in *Davis*, there was much more evidence, stronger and more compelling evidence than is the case here, on which to base a reasonable inference that appellant both knew about the drugs in the bedroom, and that she was able "to guide their destiny ... and ... to exercise dominion or control over the drugs." *Id.* at 604 (internal quotation marks and citation omitted).

Furthermore, when compared with the circumstances of two other constructive possession cases where the court affirmed the conviction, one in this jurisdiction and the other in the federal court of the District of Columbia, it is obvious that the evidence in this case is woefully thin and lacking, and it cannot meet the required "something more" or "plus factors" discussed in the case law. In *Moore v. United States*, 927 A.2d 1040 (D.C.2007), which concerned convictions for drugs and weapons offenses, including unlawful possession with intent to distribute cocaine, appellant was in close proximity to his apartment from which the police recovered substantial quantities of crack cocaine and a handgun. As we said in affirming one of the appellants' convictions involving a finding of constructive possession:

> [W]e find sufficient evidence that [appellant] constructively possessed the contraband found in [his] [a]partment. Although [appellant] was not present inside the apartment when the contraband was discovered, he was in the immediate vicinity. He had a key to the apart-

12. The government also cites *Andrews v. United States*, 922 A.2d 449, 457 n. 13 (D.C.2007), a case involving charges of first-degree premeditated murder while armed and weapons offenses. There was no charge of unlawful possession with intent to distribute drugs. Although a gun found in an occupied car was traced to appellant, there was also other evidence linking appellant to the murder—eyewitness testimony identifying him as one of the shooters, his alleged admission to involvement in the crime, and ballistics evidence. Here, by contrast, there was neither eyewitness testimony nor fingerprint or ballistics evidence linking Mr. James to the drugs.

ment; he admitted living there; he had been photographed there; and his wife was the lessee. The 91 ziplocs of crack cocaine and the semi-automatic handgun recovered from the apartment were found in the unit's only bedroom, lying in plain view next to [appellant's] personal papers. Taken together, these facts allowed a jury to infer beyond a reasonable doubt that [appellant] knew the drugs and gun were in his apartment, and that he had the ability and intent to exercise dominion and control over them.

*Id.* at 1050–51. The "something more" than proximity in *Moore* consisted of a handgun and almost 100 Ziploc bags of cocaine in plain view, in the bedroom of the apartment where appellant lived, lying next to appellant's personal papers. Here, the cocaine was not in plain view; it was inside a closed armrest. Moreover, rather than lying next to the cocaine inside the armrest, Mr. James's wallet and car registration were in the glove compartment of the Mustang.

In *United States v. Quattlebaum,* 540 F.Supp.2d 1 (D.D.C.2008), a case involving a conviction for possession of cocaine base with intent to distribute, the court summarized the applicable legal principle as follows: "[A]lthough mere proximity to [contraband] is insufficient to establish constructive possession, evidence of some other factor—including connection with the [contraband], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise—coupled with proximity may suffice." *Id.* at 5 (second and third alterations in original) (internal quotation marks omitted). One of the "plus factors" in *Quattlebaum* was that the drugs found in a truck owned by one of the defendants were recovered from defendant's shoes. *Id.* at 5, 7. The court declared:

> The government evinced evidence that defendant owned both the vehicle (gen-

erally) and the shoes (specifically) where the cocaine base was located.... Defendant had the ability to control that area by virtue of his ownership of it and the ability to exclude (or permit) others from making use of that space. As the government aptly puts it, "the truck was a place of safekeeping for the defendant's personal items, including his Nike tennis shoes."

*Id.* at 6. Other "plus factors" existed in *Quattlebaum:* "a large quantity of cash [on defendants—almost $2,000 in cash], a digital scale, and several cellular telephones, all of which are indicia of drug distribution according to the government's expert witness." *Id.* at 7.

In short, viewed in the light most favorable to the government, "the sum total of [Mr. James's] 'action,'" *see Hutchinson, supra,* 944 A.2d at 493, on which the government relies, is that he owned the unlocked Mustang, had driven it that morning (around five hours before it was shot and secured by the police), had given no one else permission to drive it, often left valuables such as his wallet in his car, spent $249 to improve his car, and had said to Detective Wood, "F that vehicle, You all can have it." For the reasons stated above, we conclude that these facts and factors, and reasonable inferences drawn from them, are insufficient as a matter of law to satisfy the elements of constructive possession in this case, and the high and demanding applicable standard of proof beyond a reasonable doubt.

Accordingly, we reverse the trial court's judgment and remand this case with instructions to enter Mr. James's acquittal of unlawful possession with intent to distribute cocaine.

*So ordered.*